JAMES McMANIS (40958)
ABIMAEL BASTIDA (303355)
CHERRIE TAN (324871)
EVAN MILLER (336473)
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:     (408) 279-8700
Facsimile:      (408) 279-3244
Email:      abastida@mcmanislaw.com

Attorneys for Plaintiff,
KYLE JOHNSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Kyle Johnson, an individual,<br><br>            Plaintiff,<br><br>     vs.<br><br>City of San Jose, a California charter city; San Jose Police Department Officer James Adgar, Badge No. 4552, an individual; Does 2 through 50,<br><br>            Defendants. | Case No. 21-cv-01849-BLF<br><br>**PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO DISMISS SECOND AMENDED COMPLAINT IN PART**<br><br>Date:         December 1, 2022<br>Time:         9:00 a.m.<br>Courtroom:   3, 5th Fl.<br>Judge:         The Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... 3

INTRODUCTION ............................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

    I.     Johnson Adequately States a § 1983 Claim for First Amendment
         Retaliation. ........................................................................................................ 9

    II.    Johnson Adequately Alleges the City's Liability under § 1983 ....................... 14

         a.   Custom or Practice ...................................................................... 15
         b.   Custom or Practice of Inaction .................................................. 20

               i.    Failure to Train .............................................................. 20
               ii.   Failure to Supervise ...................................................... 23
               iii.  Failure to Discipline ...................................................... 24
               iv.  Custom of Discrimination Establishes First
                     Amendment Liability .................................................... 25

         c.   Ratification or Decision by Policymaker ................................... 26

CONCLUSION ................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*
398 U.S. 144 (1970) ................................................................ 15

*Algzaly v. Pompeo*
No. 20-cv-03322-JCS, 2021 WL 175875 (N.D. Cal. Jan. 19, 2021) ................ 27

*Alsaada v. City of Columbus*
536 F. Supp. 3d 216 (S.D. Ohio 2021) ...................................... 22

*Anti Police-Terror Project v. City of Oakland*
477 F. Supp. 3d 1066 (N.D. Cal. 2020) .................................. 11, 12

*Armstrong v. City of Minneapolis*
525 F. Supp. 3d 954 (D. Minn. 2021) ........................................ 19

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ......................................................... 9, 20

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ............................................................... 9

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*
466 F. Supp. 3d 1206 (W.D. Wash. 2020) ............................. 11, 12, 19

*Bordanaro v. McLeod*
871 F.2d 1151 (1st Cir. 1989) ................................................ 25

*Breathe v. City of Detroit*
484 F. Supp. 3d 511 (E.D. Mich. 2020) ................................... 11

*Christie v. Iopa*
176 F.3d 1231 (9th Cir. 1999) ........................................ 21, 26, 27

*City of Canton v. Harris*
489 U.S. 378 (1989) ................................................... 20, 21, 23

*City of St. Louis v. Praprotnik*
485 U.S. 112 (1988) ...................................................... 15, 26

*Collins v. Jordan*
110 F.3d 1363 (9th Cir. 1996) .............................................. 20

*Connick v. Thompson*
563 U.S. 51 (2011) ..................................................... 19, 21, 22

*Davis v. City of Ellensburg*
   869 F.2d 1230 (9th Cir. 1989) ................................................................... 23

*Depew v. City of St. Marys, Georgia*
   787 F.2d 1496 (11th Cir. 1986) ................................................................. 24

*Doe v. United States*
   419 F.3d 1058 (9th Cir. 2005) .............................................................. 9, 20

*Don't Shoot Portland v. City of Portland*
   465 F. Supp. 3d 1150 (D. Or. 2020) .................................................... 11, 13

*Dorger v. City of Napa*
   2012 WL 3791447 (N.D. Cal. Aug. 31, 2012) ........................................... 27

*Ernst & Haas Mgmt. Co., Inc. v. Hiscox, Inc.*
   23 F.4th 1195 (9th Cir. 2022) ...................................................................... 8

*Est. of Jackson v. City of Modesto*
   No. 1:21-CV-0415 AWI EPG, 2021 WL 4819604 (E.D. Cal. Oct. 14, 2021) ........................ 24

*Est. of Mendez v. City of Ceres*
   390 F. Supp. 3d 1189 (E.D. Cal. 2019) ...................................................... 16

*Ferdik v. Bonzelet*
   963 F.2d 1258 (9th Cir. 1992) ..................................................................... 9

*Gomez v. Vernon*
   255 F.3d 1118 (9th Cir. 2001) ................................................................... 25

*Guevara v. Cnty. of Los Angeles*
   No. CV 14-08120 DDP, 2015 WL 224727 (C.D. Cal. Jan. 15, 2015) ............................. 14, 15

*Haines v. Brand*
   No. C-11-1335 EMC, 2011 WL 6014459 (N.D. Cal. Dec. 2, 2011) ......................... 14

*Harris v. Clearlake Police Dep't*
   No. 12-0864-YGR, 2012 WL 3042942 (N.D. Cal. July 25, 2012) ......................... 14

*Hernandez v. City of San Jose*
   241 F. Supp. 3d 959 (N.D. Cal. 2017) ...................................................... 27

*Horton by Horton v. City of Santa Maria*
   915 F.3d 592 (9th Cir. 2019) .................................................................... 14

*Huffman v. City of Bos.*
   No. 21-CV-10986-ADB, 2022 WL 2308937 (D. Mass. June 27, 2022) .................... 19

*Hunter v. Cnty. of Sacramento*
   652 F.3d 1225 (9th Cir. 2011) .................................................................. 24

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

*Index Newspapers LLC v. United States Marshals Serv.*
  977 F.3d 817 (9th Cir. 2020) ........................................................................... 9

*Jackson v. Barnes*
  749 F.3d 755 (9th Cir. 2014) ......................................................................... 23

*la Torre v. La Plata Cnty.*
  No. 21-CV-01422-CMA-NRN, 2022 WL 1193471 (D. Colo. Feb. 11, 2022) ........................ 25

*Long v. Cty. of Los Angeles*
  442 F.3d 1178 (9th Cir. 2006) .................................................................. 20, 21

*M.H. v. Cty. of Alameda*
  62 F. Supp. 3d 1049 (N.D. Cal. 2014) ............................................................. 21

*Martinez v. City of Santa Rosa*
  499 F. Supp. 3d 748 (N.D. Cal. 2020) ............................................................. 27

*McDougal v. Cnty. of Imperial*
  942 F.2d 668 (9th Cir. 1991) .......................................................................... 8

*Menotti v. City of Seattle*
  409 F.3d 1113 (9th Cir. 2005) ....................................................................... 19

*Mitchell v. Kirchmeier*
  28 F.4th 888 (8th Cir. 2022) ......................................................................... 27

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*
  429 U.S. 274 (1977) ...................................................................................... 9

*NAACP of San Jose/Silicon Valley v. City of San Jose*
  562 F. Supp. 3d 382 (N.D. Cal. 2021) ..................................................... 11, 20, 27

*Rodriguez v. Cnty. of Los Angeles*
  No. 816CV00674JVSSHK, 2019 WL 8756638 (C.D. Cal. Aug. 29, 2019) ........................ 15

*Samaha v. City of Minneapolis*
  525 F. Supp. 3d 933 (D. Minn. 2021) .................................................... 17, 18, 19

*Sanderlin v. City of San Jose*
  No. 20-CV-04824-BLF, 2022 WL 913055 (N.D. Cal. Mar. 29, 2022) ........... 11, 17, 20, 22, 27

*Scott v. Louisville/Jefferson Cnty. Metro Gov't*
  503 F. Supp. 3d 532 (W.D. Ky. 2020) ............................................................... 18

*Shay v. Apple Inc.*
  512 F. Supp. 3d 1066 (S.D. Cal. 2021) ............................................................... 8

*Shirazi v. Oweis*
  No. 5:21-CV-00136-EJD, 2022 WL 445763 (N.D. Cal. Feb. 14, 2022) ................... 9, 12, 13

*Starr v. Baca*
　　(9th Cir. 2011) 652 F3d 1202 ..................................................................... 9, 13, 20

*Thomas v. City of Galveston, Texas*
　　800 F. Supp. 2d 826 (S.D. Tex. 2011) ............................................................. 14, 15

*Tillman v. Tillman*
　　825 F.3d 1069 (9th Cir. 2016) ............................................................................... 9

*Linda Tirado v. City of Minneapolis*
　　521 F. Supp. 3d 833 ...................................................................................... 18, 19

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*
　　648 F.3d 452 (6th Cir. 2011) ................................................................................. 9

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

# INTRODUCTION

The City of San Jose ("City") and San Jose Police Department Officer James Adgar ("Officer Adgar" or "Adgar") (collectively "defendants") move to dismiss plaintiff Kyle Johnson's ("plaintiff" or "Johnson") Second Amended Complaint ("SAC") with the same arguments made in the last motion to dismiss.  Even so, defendants fail to meet the burden necessary to dismiss plaintiff's First Amendment retaliation and *Monell* claims.  Their motion, in substance, is a motion for summary judgment.  However, plaintiff has not yet had the benefit of discovery on these issues and at this pleading stage the law provides for all reasonable inferences to be made in favor of plaintiff.  Defendants' motion should be denied.

Defendants argue Johnson has failed to allege First Amendment retaliation because the SAC allegations do not create an inference of retaliatory animus.  According to defendants, this is due to the lack of a nexus between Officer Adgar's excessive use of force and Johnson's protected First Amendment activity.  The motion claims the SAC does not allege that Officer Adgar treated protestors differently than counter-protestors with alternative viewpoints.  However, defendants willfully ignore reality.  The "counter-protestors" were the police.  The "alternative viewpoint" was harbored by Officer Adgar.  The protests had an inherently anti-police message—a fact defendants do not dispute—which Officer Adgar and his colleagues viewed as a personal attack.  Their unhinged conduct confirms as much.  Indeed, there is no plausible alternate explanation.  Through his indiscriminate use of excessive force, Adgar tried to silence plaintiff for speaking out against him and his fellow officers.

Defendants next claim Johnson has not adequately pled *Monell* liability due to insufficient past allegations of similar misconduct to put the City on notice.  Defendants argue Johnson is merely alleging a failure to respond properly to a single event.  Again, defendants purposefully disregard the facts.  This was not a "single event."  In response to the killing of George Floyd, there were a series of protests in San Jose across several days, in different locations, and involving constitutional violations by different police officers.  The law does not require a minimum number of events or amount of time before imposing *Monell* liability.  Notably, defendants have not provided any legal authority in support of such a definite

7

1  requirement.  There need only be enough misconduct over sufficient time for a government

2  entity to notice and change course.  When a city is steeped in police violence broadcast across

3  live television and social media: one day is enough.

4      City policymakers watched officers brutalize citizens across San Jose on live television

5  beginning on May 29, 2020.  Rubber bullets, tear gas, and other "less-lethal" weapons were

6  indiscriminately deployed without a second thought.  More than 400 projectiles were fired

7  compared to only 18 arrests.  Anyone in proximity to the protests were liable to be shot.  A

8  reporter was shot by SJPD officers with no warning on live television.  That same day, city

9  officials appeared on television interviews opposite live footage of police indiscriminately firing

10  projectiles.  The City was aware of the police response, its nature, and its inadequacies.  No steps

11  were taken to change course despite numerous opportunities.

12      The motion's arguments of violence across the city give credence to the inference that

13  City policymakers—namely Police Chief Edgardo Garcia—were personally directing the

14  response to the protests.  It is reasonable to infer that a hands-on approach would be taken under

15  the circumstances surrounding the George Floyd protests.  As such, the constant and repeated

16  constitutional violations committed by SJPD officers can accordingly be credited to them.  Either

17  directly or as ratified.

18      During the 2020 George Floyd protests in San Jose, the City shirked all responsibility it

19  had to its citizens.  The protestors demonstrated against police brutality.  The police responded

20  with brutality.  There is no faster way for a nation to become morally bankrupt than the

21  authorization of its government to violently retaliate against those who speak out against it.

22      Defendant's Motion to Dismiss should be DENIED.

23  **ARGUMENT**

24      "On a motion to dismiss, it is the defendant's burden to demonstrate that plaintiff has

25  failed to state a claim."  *Shay v. Apple Inc.*, 512 F. Supp. 3d 1066, 1071 (S.D. Cal. 2021).  "It is

26  axiomatic that the motion to dismiss is viewed with disfavor and is rarely granted."  *Ernst &*

27  *Haas Mgmt. Co., Inc. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022) (quoting *McDougal v.*

28  *Cnty. of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991)) (cleaned up).  "Generally, the 'harsh

penalty' of dismissal 'should only be imposed in extreme circumstances.'" *Tillman v. Tillman*, 825 F.3d 1069, 1074 (9th Cir. 2016) (quoting *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir. 1992)).

"On a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff, taking all [] allegations as true and drawing all reasonable inferences from the complaint in [plaintiff's] favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). When a complaint's allegations are capable of more than one inference, the court must adopt whichever plausible inference supports a valid claim. *Starr v. Baca* (9th Cir. 2011) 652 F3d 1202, 1216–1217 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). Though more than one inference may be possible, "[f]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *Shirazi v. Oweis*, No. 5:21-CV-00136-EJD, 2022 WL 445763, at *5 (N.D. Cal. Feb. 14, 2022) (quoting *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*, 648 F.3d 452, 458 (6th Cir. 2011)) (internal quotations omitted).

**I.     Johnson Adequately States a § 1983 Claim for First Amendment Retaliation.**

"To succeed on a First Amendment retaliation claim, [Plaintiff] is required to show (1) he was engaged in a constitutionally protected activity, (2) Officer Adgar's actions would 'chill a person of ordinary firmness from continuing to engage in the protected activity,' and (3) 'the protected activity was a substantial or motivating factor in [Officer Adgar's] conduct.'" ECF 67 ("Order") at 15 (citing *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020)). Defendants dispute only the "substantial or motivating factor" aspect of plaintiff's First Amendment retaliation claim. ECF 74, p. 4. "This element 'may be met with either direct or circumstantial evidence' and often 'involves questions of fact that normally should be left for trial.'" ECF 67 (Order), p. 16:2-4 (quoting *Index Newspapers LLC*, 977 F.3d at 827). A § 1983 claimant who asserts a free speech retaliation claim is not required to demonstrate that the illicit factor was the sole or even dominant motive for the government action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87 (1977).

///

1    As was previously described in the FAC, Johnson was shot from behind with a 40mm

2 projectile round while peacefully engaged in protected First Amendment protest against police

3 brutality in a public forum after a water bottle was harmlessly thrown up in the air by another

4 person.  *See* ECF 47, ¶ 16-18.   Johnson was not violently confronting police and was fleeing

5 from their use of weapons when he was shot.  *Id.*  In its March 16 order, the Court stated that

6 "the plausible inference from [these] allegations [in the FAC] is that Officer Adgar fired in

7 response to the water bottle being thrown."  ECF 67, p. 16:15-16.  The SAC, however, contains

8 additional factual allegations which clarify that the anti-police sentiments of the protests were the

9 substantial and/or motivating factor in the unlawful use of force against the demonstrators,

10 including plaintiff.  ECF 73, ¶¶ 24-37.

11    For example, "during the five days of protest, police officers used force to target

12 demonstrators based upon the demonstrators' race and their belief that police should be held

13 accountable for their actions."  ECF 73, ¶ 14.  "[D]emonstrators exhibited peaceful behavior

14 without antagonizing the police such as playing a guitar while marching, kneeling on the ground

15 and praying, standing with their hands up, and trying to walk away."  *Id.*, ¶ 15.  The SJPD

16 engaged in the use of " 'kettling' (also known as containment or corralling), which is a police

17 tactic where officers surround a large group of people in a space by enclosing them so there is no

18 escape."  *Id.*, ¶ 19.  During the protests, the SJPD "used less-lethal force including tear gas,

19 batons, rubber bullets, bean bags, and physical force against peaceful demonstrators."  *Id.*, ¶ 20.

20 The SJPD so excessively used munitions that it was required to make additional purchases.  *See*

21 *Id.*, ¶ 21.  "Officer Adgar held views contrary and hostile towards the demonstrators and the

22 protests.  He employed excessive force as a result of his discriminatory views towards the

23 demonstrators and his disagreement with the protest."  *See generally Id.*, ¶ 33.  Officer Adgar

24 admits, by descriptions in his own report, that he shot multiple protestors at different times who

25 did not actively pose a threat to him or anyone else.  *See Id.*, ¶ 33.  Officer Adgar blatantly

26 flouted multiple department policies including firing his weapon without identifying a target and

27 shooting protestors with a projectile weapon without an apparent ability to make an arrest.  *See*

28 *Id.*, ¶ 33.  The absence of any threat necessitating the use of force coupled with Adgar's

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

1    indiscriminate use of force gives rise to the inference that the protestor's speech and their

2    message against police brutality was a substantial or motivating factor for Adgar's conduct.

3      The allegations in the SAC are sufficient to support a claim of First Amendment

4    retaliation.  *See NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382,

5    399–400 (N.D. Cal. 2021) (finding retaliatory animus for same protests and holding "given that

6    the protestors were specifically protesting police misconduct, it is reasonable to allege that the

7    protestors' viewpoint was a substantial or motivating cause – even if not necessarily the sole

8    cause – behind the defendants' conduct."); *Sanderlin v. City of San Jose*, No. 20-CV-04824-

9    BLF, 2022 WL 913055, at *7–8 (N.D. Cal. Mar. 29, 2022) (same protests and finding retaliatory

10   animus supported by allegations that police fired less-lethal munitions at peaceful and/or

11   nonconfrontational protestors, into an apartment, and fired so many rounds that City resources

12   had become depleted); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police

13   Dep't*, 466 F. Supp. 3d 1206, 1213–14 (W.D. Wash. 2020) ("The use of indiscriminate weapons

14   against all protesters—not just the violent ones—supports the inference that SPD's actions were

15   substantially motivated by Plaintiffs' protected First Amendment activity."); *Don't Shoot

16   Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155–56 (D. Or. 2020) (inference of

17   retaliatory intent supported by allegations that less-lethal munitions, including rubber bullets,

18   were used against people attempting to leave a protest area); *Anti Police-Terror Project v. City of

19   Oakland*, 477 F. Supp. 3d 1066, 1087–88 (N.D. Cal. 2020); *Breathe v. City of Detroit*, 484 F.

20   Supp. 3d 511, 518 (E.D. Mich. 2020) (indiscriminate use of less-lethal munitions "may alone be

21   enough to support the inference that the police officers were at least partially motivated by

22   Plaintiffs' protected activity").

23     Defendants argue the SAC suffers from the same issues as the FAC by focusing on the

24   general similarities between the allegations in the two pleadings.  ECF 74, p. 4-5.  However, in

25   dismissing the First Amendment retaliation claim from the FAC, the Court's concern was not

26   about the precise nature of the events in each allegation.  Rather, it was the extent to which they

27   occurred.  Order at 17:24-26 ("These allegations alone are insufficient for the Court to draw the

28   same inference as was drawn in the two cases Johnson cites, which included much more

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

1   extensive allegations of police violence.").  Accordingly, Defendants' argument misses the mark.

2   Defendants also argue that the Court's prior Order required plaintiff to add, among other

3   things, allegations of an "inaudible loudspeaker" and that "journalists and medics" were targeted.

4   ECF 74, 5:13-22.  This is incorrect.  The Court was only comparing allegations in *Anti Police-*

5   *Terror Project*, 477 F. Supp. 3d 1066 with the FAC and mentioning examples.  ECF 67, p. 17:4-

6   14.  The Court did not require the allegation of any specific fact.  *See Id*.  Although these facts

7   are, indeed, alleged.  See ECF 73, ¶¶ 17, 49.

8   Despite the irrelevancy, Defendants argue that Johnson's allegations prove the speaker

9   was audible beforehand because Johnson heard an announcement after being shot.  ECF 74,

10  5:16-18; *see* ECF 73, ¶ 31.  The plausible inference drawn from this allegation bears no weight

11  on the decipherability of the loudspeaker.  *See* ECF 73, ¶ 31.  Instead, it supports the inference

12  that the police did not issue *any* warning until *after* employing excessive force.  *Id*.  This

13  inference supports the conclusion that the officers purposefully surprised the protestors with

14  excessive force because of their animus against plaintiff and the other protesters engaging in free

15  speech.  *See Shirazi*, 2022 WL 445763, at *5 (allegations that protestors who were subjected to

16  indiscriminate force were peaceful, did not present a threat, and not given any dispersal warning,

17  were sufficient to support inference that actions were motivated by First Amendment activity).

18  Defendants also argue that plaintiff has not alleged facts regarding Adgar's animus via

19  comments about the protest or that "officers particularly targeted [plaintiff] and other Black

20  Lives Matter protestors while not targeting counterprotestors."  ECF 74, p. 5:19-21.  As

21  referenced above, this argument misses the mark.  The counter-protestors were the police

22  themselves.  It is sufficient that the SAC alleges facts showing "[t]he use of indiscriminate

23  weapons against all protesters—not just the violent ones" because this "supports the inference

24  that [SJPD's] actions were substantially motivated by Plaintiffs' protected First Amendment

25  activity."  *Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d at 1214.  At different times

26  during the protest, Adgar shot multiple other protestors who did not actively pose a threat or

27  were trying to leave the protest.  See ECF 73, ¶ 33.

28  ///

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

1    Defendants argue the allegations that Adgar purposefully ignored department policies do

2  not support an inference of animus.  ECF 74, p. 5:23-6:13.  However, Defendants' assertion

3  contradicts their arguments that there was not a failure to train officers.  If this conduct does not

4  evidence a failure to train, then such violations must have been on purpose.

5    Finally, defendants attempt to introduce their own competing inferences for several of

6  Johnson's allegations.  It would be improper for the Court to dismiss the SAC on such a basis

7  even if they are plausible.  *Starr*, *supra*, (9th Cir. 2011) 652 F3d at 1216–1217 (court must adopt

8  whichever plausible inference supports a valid claim); *Shirazi*, 2022 WL 445763, at *5 (ferreting

9  out most likely reason for defendant's action not appropriate at pleadings stage).  Nonetheless,

10  defendants' competing inferences are not plausible.  Johnson alleges the actions described in

11  Adgar's report demonstrate that he was not using his projectile weapon to prevent injury, as

12  required by department policy, which supports an inference of animus.  ECF 73, ¶ 33.  Adgar

13  described shooting multiple people with that he believed had already previously thrown bottles,

14  did not have another bottle, and were leaving the protest.  *Id*.  Defendants argue the plausible

15  inference here is that Adgar was acting to prevent injury because "[b]eing struck by a foam baton

16  round after throwing a bottle will make a person think twice before doing it again."  ECF 74, p.

17  6:2-13.  Defendants' claim of an intent to exact extra-judicial punishment—as opposed to an

18  animus against the protest's message—is nonsensical, unsupported by citation to legal authority,

19  and does not contravene the idea that even this intent could have been motivated by the First

20  Amendment activity.  *See Don't Shoot Portland*, 465 F. Supp. 3d at 1155–56 (use of less-lethal

21  munitions on protestors leaving demonstration supports inference that prevention of criminal

22  activity not sole purpose of use of force and may have been motivated by intent to interfere with

23  constitutional expression).

24    Johnson's allegation that Adgar fired his weapon without identifying a target, and

25  admitted as much to fellow officers, supports the plausible inference that he was purposefully

26  firing his weapon indiscriminately.  ECF 73, ¶ 33.  The allegation that Adgar did this in direct

27  contravention of department policy supports the plausible inference that the anti-police message

28  of the protests motivated him to ignore department policy.  ECF 73, ¶ 33.  The only plausible

13

1    alternate inference is that Adgar was inadequately trained and did not know of the policy, which

2    Defendant also disputes.  (*See Monell* discussion below).  Defendants argue this allegation

3    supports the inference that he "has identified a target but is having difficulty maintaining sight of

4    that target."  ECF 74, p. 6:18-19.  The plain language of the allegation defeats this argument.

5    ECF 73, ¶ 33 ("Officer Adgar's body worn camera footage captures him telling other officers

6    that he couldn't see where he was firing.").  This assertion also does not preclude an inference of

7    animus because, even accepting it, the allegation still alleges that Adgar fired his weapon despite

8    not having a lawful reason to do so.

9    **II.      Johnson Adequately Alleges the City's Liability under § 1983.**

10          "*Monell* established that municipalities can be liable for infringement of constitutional

11   rights, under certain circumstances.  [Citation.]  In particular, municipalities may be liable

12   under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice

13   or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final

14   policymaker."  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

15   The SAC sufficiently states a claim for the City's liability under each of these theories.  "In the

16   context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that

17   a plaintiff will have access to (or personal knowledge of) specific details regarding the existence

18   or absence of internal policies or training procedures prior to discovery.  Accordingly, only

19   minimal factual allegations should be required at the motion to dismiss stage."  *Haines v. Brand*,

20   No. C-11-1335 EMC, 2011 WL 6014459, at *5 (N.D. Cal. Dec. 2, 2011) (*quoting Thomas v.

21   City of Galveston, Texas*, 800 F. Supp. 2d 826, 842–43 (S.D. Tex. 2011) and collecting cases);

22   *Guevara v. Cnty. of Los Angeles*, No. CV 14-08120 DDP, 2015 WL 224727, at *3 (C.D. Cal.

23   Jan. 15, 2015) (same); *Harris v. Clearlake Police Dep't*, No. 12-0864-YGR, 2012 WL 3042942,

24   at *5 (N.D. Cal. July 25, 2012) ("only minimal specificity is required").  "Allegations that

25   provide [adequate] notice could include, but are not limited to, *past incidents of misconduct to

26   others*, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the

27   open, the involvement of multiple officials in the misconduct, or *the specific topic of the

28   challenged policy or training inadequacy.* Those types of details ... help to satisfy the

14

requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests."  *Guevara v. Cnty. of Los Angeles*, No. CV 14-08120 DDP, 2015 WL 224727, at *4 (C.D. Cal. Jan. 15, 2015) (*quoting Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 842–43 (S.D. Tex. 2011)) (emphasis in original).

Defendants only address two *Monell* theories ("failure to train or supervise" and "custom of discrimination").  Markedly, despite using language referring to supervision, they conflate failure to train and failure to supervise.  *See* ECF 74, p. 8:20-16:16.  The City has failed to meet its burden of demonstrating that Plaintiff has not stated a claim.  In sum, the City's motion attempts to introduce new and improper evidence, implausible inferences, and arguments that are either irrelevant or without citation to authority in order to argue that Johnson's allegations do not prove the existence of a municipal policy, practice, or custom.[1]  *Id.*  However, "at this stage of the litigation, whether the policies alleged by Plaintiff actually exist is 'a question for the merits phase of the litigation.'"  *Rodriguez v. Cnty. of Los Angeles*, No. 816CV00674JVSSHK, 2019 WL 8756638, at *8 (C.D. Cal. Aug. 29, 2019) (quoting *Guevara v. Cnty. of Los Angeles*, No. CV 14-08120 DDP, 2015 WL 224727, at *2 (C.D. Cal. Jan. 15, 2015)).

### a.  Custom or Practice

The SAC sufficiently alleges an unwritten custom or practice of using excessive force, including the use of projectile weapons, tear gas, and kettling, with little or no warning against people participating in protests against the racist killings of black people by police officers.  A municipality may be held liable on the basis of an unconstitutional policy if a plaintiff can "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)); *see* Order, p. 21:2-6.  A custom or practice may constitute a municipality's policy even though it is contrary to a charter, ordinance, regulation, or

---

[1] Although Defendant's motion only addresses two of plaintiff's *Monell* theories, responsive discussion is included below where relevant for the Court's convenience.

1    other formally promulgated policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130–31

2    (1988). "The inquiry regarding adequacy of notice is highly specific to the facts of the case

3    under consideration; the line between adequate and inadequate evidence of repeated

4    constitutional violations does not involve a specific quantum or number of allegations." *Est. of*

5    *Mendez v. City of Ceres*, 390 F. Supp. 3d 1189, 1209 (E.D. Cal. 2019). Previously, the Court

6    held the FAC could not support this species of *Monell* because Johnson "has not sufficiently

7    alleged any other examples of the use of less lethal weapons on protestors." *See* ECF 67, p. 21.

8    Now, the SAC adequately alleges the existence, and the City's awareness, of this unofficial

9    custom. *See* ECF 73, ¶¶ 1-2, 12-23, 24-37, 38-67.

10   "Starting May 29, 2020, for five days, countless people gathered on the streets of San

11   Jose peacefully to protest the killing of George Floyd, police brutality, and systemic racism."

12   ECF 73, ¶ 12. "In response to protests against police brutality, the police chose to engage in

13   brutality." ECF 73, ¶ 14. The police engaged in this activity even though most protestors were

14   engaged in peaceful activity such as playing guitar and praying. *See* ECF 73, ¶ 15. Police even

15   shot protestors who were already leaving the protests. *Id.* An excessive police presence

16   preemptively gathered without reason before any isolated violent incidences occurred. *See* ECF

17   73, ¶ 17. Protestors were subjected to this brutality without warning. *See* ECF 73, ¶ 18. In

18   doing this, the police employed a variety of "less-lethal" weapons including "tear gas, batons,

19   rubber bullets, bean bags, and physical force." *See* ECF 73, ¶ 20. Such a large quantity of

20   munitions were used against protestors that the SJPD had to make an additional purchase after

21   only one day—this usage corresponded with only 18 arrests. ECF 73, ¶ 21, 58. Some examples

22   from May 29, 2020 include: aggressive behavior filmed of Officer Jared Yuen; a good Samaritan

23   who tried to assist a police officer that was knocked unconscious and was later shot by Officer

24   Yuen; a peaceful demonstrator who was shot in the genitals; a woman supporting the protestors

25   who was shot with rubber bullets and tear gas canisters through the windows of her own home

26   by police. ECF 73, ¶¶ 50-53, 55, 56. The City knew of the aggressive nature of its officers due

27   to complaints going back years. *See* ECF 73, ¶ 57.

28   ///

16

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

1        Given the widespread reporting in the media, including every local Bay Area television

2   station on and before May 29, and the involvement of City officials, the only reasonable

3   inference is that the City was aware of the custom or practice of its police officers in responding

4   to the George Floyd protests.  It would have been impossible for City policymakers to not know

5   about what was happening.  *See* ECF 73, ¶ 49.  In a detailed fashion, television reporters

6   described and displayed real-time footage of SJPD officers subjecting the public to

7   indiscriminate excessive force, often without warning.  *Id.*  For example, on May 29, 2022, a

8   reporter for CBS KPIX5 News, Len Ramirez, was shot with a projectile without warning on live

9   television while closely embedded with the protestors.  *Id.*  Immediately thereafter, the CBS

10  broadcast anchors noted that police officers were "firing directly" at protestors, even stating that

11  "you can clearly see police officers firing into the crowd, it appears to be some sort of a

12  projectile."  *Id.*  Other media reporting included direct evidence that city policymakers were

13  specifically aware of the depictions in the media—rare direct evidence that is unheard of in these

14  types of cases.  For example, in a KTVU Fox 2 News broadcast on May 29, 2022, Mayor Sam

15  Liccardo was interviewed live on-air alongside live footage of SJPD officers subjecting the

16  public to excessive force with less-lethal weapons.  *Id.*  Mayor Liccardo admitted both that he

17  was aware of the situation at City Hall and that, right before his on-air interview, he had

18  discussed the use of less-lethal weapons at City Hall with Police Chief Edgardo Garcia, who was

19  also aware of the situation.  *Id.*

20        In *Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933 (D. Minn. 2021) the court held

21  that a plaintiff alleged facts supporting the existence of an unconstitutional policy or custom of

22  police officers using excessive force against George Floyd protestors where the complaint

23  described police misconduct occurring on different days in different places by different police

24  officers.  *Id.* at 941-42.  The allegations included incidents of police using less-lethal munitions

25  against protestors with little or no warning including "protesters who were already dispersing,

26  and protesters who could not disperse because their escape had been blocked by law enforcement

27  officers."  *Id.*  A scenario that is, for these purposes, identical to that which occurred in San Jose

28  at this same time, as alleged in the SAC.  *See*, *e.g.*, ECF 73, ¶¶ 12 & 15 (multiple days and

1    locations), 17-18 & 49 (lack of warning), 15 & 29 (shot while attempting to flee), 19 (escape

2    blocked).

3           In *Tirado v. City of Minneapolis*, the court held a plaintiff had sufficiently alleged *Monell*

4    liability notice where the complaint identified "at least five incidents of use of force" and

5    explained "how the City allegedly became aware of those incidents through broad reporting by

6    news outlets, the City's own social media monitoring efforts, and direct outreach by media."

7    *Tirado*, 521 F. Supp. 3d 833, 843-44; *see also Scott v. Louisville/Jefferson Cnty. Metro Gov't*,

8    503 F. Supp. 3d 532, 539 (W.D. Ky. 2020) (holding "actual or constructive notice of a pattern of

9    constitutional violations" was sufficiently alleged where "complaint cites to local and national

10   news articles that report on [police department's] alleged use of aggressive crowd control

11   methods, such as tear gas and rubber bullets, on what appeared to be peaceful demonstrators").

12          The City argues that all of the incidents in the SAC—even those that happened on

13   different days and locations—are contemporaneous and cannot establish notice for *Monell*

14   liability purposes.[2]  *See* ECF 74, p. 11:13-14:12.  Specifically, the City claims that the entire

15   period of the protests are a "single incident" that cannot support a *Monell* liability claim "even if

16   that incident is spread out over hours or days, and even if there were different city employees

17   responsible for the alleged violations."  ECF 74, p. 13:16-18.  This argument defies all logic and

18   reason.  Although the demonstrations may be grouped in the sense that they were all protesting

19   the same cause, they cannot be grouped as a single continuous incident.  The SAC does not

20   allege protestors camped out at City Hall or stayed in the plaza for 24-hours a day.  Nor does it

21   allege protesting occurred in a single location.  There are no allegations that the protests were

22   centrally organized or pre-planned to occur for a specific amount of time.  In contrast, the SAC

23   alleges demonstrations occurred for five days *across* San Jose.  *See, e.g.*, ECF 73, ¶ 12 ("Starting

24   May 29, 2020, for five days, countless people gathered on the streets of San Jose").  Notably, the

---

26   [2] While the City made this argument for purposes of Plaintiff's failure to train claim, Plaintiff

27   anticipates that Defendant will argue it applies to all of Plaintiff's *Monell* theories. As such,

28   Plaintiff addresses it here.

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

1  *Samaha* court rejected this precise argument.  See *Samaha, supra*, 525 F. Supp. 3d at 942 (D.

2  Minn. 2021) ("The Court finds that the Complaint alleges facts which would support the

3  existence of an unconstitutional policy or custom.  Plaintiffs allege similar misconduct occurring

4  on different days and in different places, by many different MPD officers, during the George

5  Floyd protests.").  To make this "contemporaneous" argument, the City primarily relies on

6  *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011) where the court rejected an argument that the

7  nondisclosure of a <u>single</u> report by up to four different prosecutors (or also additional evidence

8  relating to a single person) could constitute multiple instances.  *Id.*  In contrast, here, dozens of

9  police officers inflicted excessive force, and other constitutional violations, against large crowds

10  of people at different locations on different days.  *See, generally*, ECF 73, ¶¶ 12-67.

11       The *Samaha* court held even where alleged incidents are condensed into a relatively short

12  period of time, they, nonetheless, may "permit the reasonable inference that the time period was

13  sufficiently long for the City Defendants to take notice of the [] officers' alleged misconduct and

14  change course."  *Samaha, supra*, 525 F. Supp. 3d at 942; *see also Tirado, supra*, 521 F. Supp. 3d

15  at 840–43 (same); *Armstrong v. City of Minneapolis*, 525 F. Supp. 3d 954, 962–64 (D. Minn.

16  2021) (same); *Huffman v. City of Bos.*, No. 21-CV-10986-ADB, 2022 WL 2308937, at *7 (D.

17  Mass. June 27, 2022) ("The City's argument that the allegations are not enough to support

18  a *Monell* claim because they rest only on 'one night of civil unrest' is unavailing. [Citation] In

19  addition to the fact that Plaintiffs have suggested that similar conduct occurred during

20  demonstrations on surrounding days, 'egregious instances of misconduct' even when 'relatively

21  few in number but following a common design, may support an inference that the instances

22  would not occur but for municipal tolerance of the practice in question.'").  The same is true

23  here.  The SAC alleges a handful of incidents occurring a day or more before plaintiff's injuries.

24  These allegations permit a reasonable inference of a custom during a time that was sufficiently

25  long enough for the City to take notice.  *See, e.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1148

26  (9th Cir. 2005) (five incidents on same day sufficient to show custom or practice).

27       Defendants next argue that the protests of May 29 were not peaceful and, impliedly, that

28  the SJPD was justified in its actions.  *See* ECF 74, p. 11:1-12.  However, "the proper response to

1   potential and actual violence is for the government to ensure an adequate police presence, and to

2   arrest those who actually engage in such conduct, rather than to suppress legitimate First

3   Amendment conduct as a prophylactic measure."  *Black Lives Matter Seattle-King Cnty., supra*,

4   466 F. Supp. 3d at 1213 (quoting *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996)).

5   Shooting rubber bullets and tear gas in response to a single individual throwing a single water

6   bottle in the air—which landed on the ground harming no one—is not justified by the conduct of

7   a few isolated bad actors.  *See* ECF 73, ¶¶ 24-31.  In fact, the plausible inference is that the water

8   bottle was a *pretext* to shoot the protestors.  Further, the City appears to be making a request for

9   judicial notice of their interpretation without actually making the request.  Regardless, inferences

10   must be construed in plaintiff's favor, even when competing inferences are presented.  *Doe*, 419

11   F.3d at 1062 (9th Cir. 2005); *Starr*, 652 F3d at 1216–1217; *Ashcroft*, 556 U.S. at 681 (2009)).

12       The City argues that Mayor Liccardo and Chief Garcia are not final policymakers for

13   *Monell* purposes.  See ECF 74, p. 14:21-15:10, 15:11-20.  These arguments by the City have

14   already been rejected in other cases concerning the exact same protests.  See *NAACP of San*

15   *Jose/Silicon Valley*, 562 F. Supp. 3d at 396–98; *Sanderlin*, 2022 WL 913055, at *6–7, 16.

16       **b.    Custom or Practice of Inaction**

17           **i.    Failure to Train**

18       Plaintiff's injuries were caused by the City's failure to train its officers in the use of force

19   and crowd control tactics including, but not limited to, the use of projectile impact weapons and

20   kettling.  This failure to train resulted in violations of the constitutional rights of plaintiff and

21   other members of the public.  Notably, the SJPD implemented new policies regarding the

22   permissible use of less-lethal weapons immediately before the protests and failed to train its

23   officers on the new policies.  *See* ECF 73, ¶ 38.  "Failure to train an employee who has caused a

24   constitutional violation can be the basis for § 1983 liability where the failure to train amounts to

25   deliberate indifference to the rights of persons with whom the employee comes into contact."

26   *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v.*

27   *Harris*, 489 U.S. 378, 388 (1989); *see* Order, p. 19:13-27.

28       Plaintiff has adequately pled the City's liability under *Monell* as the result of this failure

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

to train its police officers.  *See* ECF 73, ¶¶ 38-63.  "[T]raining on the use of, and the

constitutionality of using, less lethal firearms against peaceful demonstrators was minimal and

infrequent."  ECF 73, ¶ 40.  "[T]he SJPD conducted no ongoing training for patrol officers

regarding the 40mm launchers used against the George Floyd civil rights demonstrators."  ECF

73, ¶ 41.  "In spite of the lack of necessary training, the SJPD allowed untrained officers to be

equipped with less-lethal firearms during the George Floyd civil rights demonstrations."  *Id.* at ¶

43.  The so-called "training" that may have been given to some officers encouraged them to use

force improperly.  *See Id.*, ¶ 46. Subsequently published reports commissioned by the City and

SJPD admit "that there was lack of training and experience, insufficient staffing levels, and a

need to update policies and procedures which impacted the SJPD's response to the George Floyd

protest" and "that the vast majority of officers and sergeants had not received the appropriate

training; any training regarding civil disorder had been sparse for years and provided only to a

relatively small segment of the SJPD organization."  *Id.*, ¶¶ 22-23.[3]

The SAC satisfies both single incident liability principles and demonstrates the City had

notice of a pattern of similar constitutional violations.  A single incident may establish *Monell*

liability where inadequate police training "amounts to deliberate indifference to the rights of

persons with whom the police come into contact." *See City of Canton*, 489 U.S. at 388-90

(1989); *see also Christie v. Iopa*, 176 F.3d 1231, 1235, 1240-41 (9th Cir. 1999).  A plaintiff may

show failure to train "without showing a pattern of constitutional violations where a violation of

federal rights may be a *highly predictable consequence* of a failure to equip law enforcement

officers with specific tools to handle recurring situations."  *M.H. v. Cty. of Alameda*, 62 F. Supp.

3d 1049, 1082 (N.D. Cal. 2014) (internal quotation marks omitted, emphasis added) (quoting

*Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006)); *see also Connick*, 563 U.S. at

---

[3] As the Court recognized in its order, "a report issued after the protests could not have put the City on notice prior to the protests about a failure to adequately train personnel."  ECF 67, p. 20 n. 6.  However, these reports do establish the existence of a lack of training at the time of the protests.

1   63-64, 71.

2       In response to the George Floyd civil rights protests, the SJPD deployed officers who had

3   received no training in the use of 40mm projectile weapons.  *See* ECF 73, ¶ 43-44.  For example,

4   neither Officer Adgar nor Officer Jared Yuen had any training in the use of 40mm munitions

5   prior to their deployment at the protests.  ECF 73, ¶ 45.  The damage, pain, and suffering caused

6   by the actions of these untrained officers were highly predictable consequences of their

7   deployment with weapons for which they had no training.  While some of the officers at the

8   protests may have received some 40mm munitions training, that does not alleviate the fact that a

9   litany of their colleagues had received no training at all.

10      Additionally, *none* of the SJPD officers at the protests had received *any* training

11  regarding brand new policies set by the department a week before the protests.  *See* ECF 73, ¶

12  38.  Officers had not been trained on the use of 40mm weapons in crowd control situations.  *Id.*

13  at ¶¶ 40-44.  Chief Garcia became aware that protests would occur roughly six days after

14  implementing the new 40mm policy.  *Id.* at ¶ 38.  SJPD officers should not have been deployed

15  with 40mm projectile weapons to mass demonstrations, without specific training on that weapon

16  for that instance, because it is highly predictable that they will misuse them when confronted

17  with large groups of people, as compared to just one person.  *See Sanderlin*, 2022 WL 913055, at

18  *15 ("The Court finds that Plaintiffs have made out a failure to train claim based on the change

19  in policy immediately before the protest regarding the permissible uses of less-lethal weapons").

20      The SAC also alleges a pattern of similar violations that put the City on notice of a need

21  for additional or different training for which the City was deliberately indifferent.  *See Connick*

22  *v. Thompson*, 563 U.S. 51, 62 (2011); ECF 73, ¶¶ 38-63.  The above discussion regarding *Monell*

23  notice to the City, via instances of constitutional violations establishing custom or policy, applies

24  with equal force here.  *See* section II.b. above.  This is because these alleged incidents displayed

25  both the aforementioned custom *and* a lack of training by SJPD officers in the use of 40mm

26  weapons in crowd control situations.  *See, e.g.,* ECF 73, ¶¶ 49, 50-53, 55-57.

27      Training that encourages violence, when it should be encouraging de-escalation, can

28  support a claim of failure to train.  *See* ECF 73, ¶ 46; *Alsaada v. City of Columbus*, 536 F. Supp.

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

3d 216, 272 (S.D. Ohio 2021) (inference of failure to train where alleged "crowd-control training instructed that not all protestors standing with their hands raised were peaceful, that children and the elderly were pawns and shields, that volunteers distributing water on a hot day were fomenting violence, and that protestors wearing protective gear for fear of CPD force were 'not actually nonviolent,' so officers needed to be "mentally prepared to use force" against them.")

### ii. Failure to Supervise

Johnson adequately alleges *Monell* liability on a theory of failure to supervise.  The deliberate indifference standard in *City of Canton*, 489 U.S. 378, 390 (1989) extends to liability claims predicated on inadequate supervision.  *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).  Under this theory, deliberate indifference is established when a city fails to take corrective remedial action after being put on actual or constructive notice that its employees are engaging in unconstitutional acts.  *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014).

As with the failure to train theory of liability, the above *Monell* notice discussion regarding custom or policy will apply with equal force here because the alleged incidents displayed both the aforementioned custom *and* a lack of supervision.  *See* section II.b. above.  The key distinction here is that the City was aware that its officers were engaged in misconduct and did nothing to correct or stop this behavior.  *See Jackson*, 749 F.3d at 763.  This occurred to such a degree that the City's inaction amounts to a deliberate indifference towards those members of the public for whom SJPD officers come into contact.

On May 29, 2020, "SJPD officers [] deployed thirty-one pepper ball projectiles, thirty-two tear gas canisters, and at least 400 foam batons or rubber bullets into crowds of peaceful demonstrators."  *Id.* at ¶ 21.  This resulted in only 18 arrests made.  ECF 73, ¶ 58.  A ratio of 400 or more foam baton rounds fired compared to only 18 arrests supports the inference that police officers were indiscriminately using their weapons.  This inference is logical when considering the debilitating firepower of a 40mm projectile and that SJPD officers are required to identify a target before firing their weapon.  *See Id.* ¶¶ 29-31, 33.  400 projectiles is simply too many used projectiles to arrest only 18 people.  The lack of supervision and inquiry into this statistic is sufficient to infer those with supervisory responsibilities within the City were not doing their job.

23

1    The inference that SJPD officers were indiscriminately using their weapons is

2    compounded by the video footage, widely circulated on social media, of Officer Yuen behaving

3    recklessly, and of live news broadcast footage of SJPD officers indiscriminately firing projectiles

4    without warning at peaceful protestors and other nearby innocent bystanders—including a CBS

5    KPIX reporter, embedded in the crowd, who was describing the situation live on-air and clearly

6    not involved in the protests.  *See* ECF 73, ¶¶ 49-53; *see also Id.* ¶¶ 55-63; *see* section II.b. above.

7    These instances put the City on actual or constructive notice that it needed to supervise its

8    officers.  The City could have taken any number of actions after May 29 to prevent injury to

9    protestors on May 30, such as deciding to not deploy officers to protests with 40mm projectile

10   weapons and tear gas.  Instead of correcting course, the City redeployed SJPD officers with less-

11   lethal weapons on May 30 without any different instruction.  ECF 73, ¶¶ 24-32.  This included

12   officers like Jared Yuen who had fired roughly a quarter of the 400 or more 40mm projectiles

13   used on May 29.  *See Id.*, ¶¶ 21, 52.  By failing to supervise its officers, after observing the

14   events of May 29, the City was deliberately indifferent towards the welfare of the May 30

15   protestors who the City knew would inevitably be the subject of injury—both constitutionally

16   and physically—if remedial action were not taken.  *See*, *e.g.*, *Est. of Jackson v. City of Modesto,*,

17   No. 1:21-CV-0415 AWI EPG, 2021 WL 4819604, at *17 (E.D. Cal. Oct. 14, 2021) (allegations

18   supported inadequate supervision where no remedial actions were taken by supervisor, regarding

19   officers' "contacts with those impaired due to substances or mental health conditions," despite

20   "numerous instances of alleged excessive force."); *Depew v. City of St. Marys, Georgia*, 787

21   F.2d 1496, 1499 (11th Cir. 1986) (finding violations of police department policies sufficient to

22   put the city on notice of the need to supervise and the city's failure to rectify the situation as

23   "precisely the type of informal policy or custom that is actionable under section 1983.")

24   ### iii.        Failure to Discipline

25   A claim of *Monell* liability may also be premised upon a city's failure to discipline its

26   employees, such that it amounts to a deliberate indifference to the rights of those whom they

27   come into contact with.  *See Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 (9th Cir.

28   2011).  The allegations underlying plaintiff's above-discussed policy of inaction theories apply

PLAINTIFF KYLE JOHNSON'S OPPOSITION TO DEFENDANT CITY OF SAN JOSE'S MOTION TO
DISMISS SECOND AMENDED COMPLAINT IN PART; Case No. 21-cv-01849-BLF

1   equally with regard to the City's failure to discipline its officers for their misconduct during the

2   protests, which only further encouraged the behavior.  *See* section II.b.

3       Additionally, prior to the protests, the SJPD had a history of failing to investigate and

4   discipline officers regarding complaints submitted by the public.  *See* ECF 73, ¶ 57.  For

5   example, despite egregious behavior on May 29 which resulted in 1,079 complaints, Officer

6   Jared Yuen was not disciplined.  *See* ECF 73, ¶¶ 50-55.  He was permitted to return to duty on

7   May 30 where he continued to violate the constitutional rights of members of the public.  *Id.*

8   Such failure to discipline supports a custom or policy, which endorses and encourages

9   constitutional violations, amounting to deliberate indifference.  *See, e.g.*, *Gomez v. Vernon*, 255

10  F.3d 1118 (9th Cir. 2001) (upholding district court's determination that corrections department

11  condoned the policy of retaliation where top correctional officers failed to investigate retaliation

12  complaints and failed to discipline offending officers).

13      The Court previously rejected plaintiff's ratification argument premised on Chief

14  Garcia's post-event approval of Officer Yuen's actions.  See ECF 67, p. 20 n. 5.  However, this

15  lack of discipline shows that Officer Yuen was acting pursuant to custom or policy at the time of

16  the incidents.  "[L]ack of discipline can prove the existence of a policy or custom … [c]ertainly,

17  a failure to discipline the individual officers here could demonstrate that they were acting

18  pursuant to their training, policy, or custom."  *de la Torre v. La Plata Cnty.*, No. 21-CV-01422-

19  CMA-NRN, 2022 WL 1193471, at *9 (D. Colo. Feb. 11, 2022); see *Bordanaro v. McLeod,* 871

20  F.2d 1151, 1166 (1st Cir. 1989) (upholding lower court's decision to admit "post-event evidence

21  of... the failure to take strong disciplinary action" because evidence could tend to show existence

22  of policies in effect before police officers beat plaintiff).

23          **iv.       Custom of Discrimination Establishes First Amendment Liability**

24      Defendants attack plaintiff's allegations regarding discrimination by the SJPD as failing

25  to allege an equal protection claim.  *See* ECF 74, 16:19-18:6.  This is a distraction.  The

26  statistical evidence provides support for plaintiff's *Monell* claim as it relates to violations of First

27

28

1  Amendment rights.[4]  *See* ECF 73, ¶¶ 64-67.  These allegations support the plausible inference

2  that "Defendants employed excessive force against plaintiff and other peaceful protesters at the

3  George Floyd protests *because* the message of the demonstrations was focused on racist killings

4  of Black people by police throughout the country [including the SJPD]."  ECF 73, ¶ 64

5  (emphasis added).  The SJPD's longstanding practice of discrimination against people of color, a

6  parallel custom, was in part the moving force behind the department's widespread use of

7  excessive force against the protestors.[5]  The demonstrations were targeted due to their

8  association with this group of people, *i.e.*, for the fact of their speaking out in support of a group

9  the SJPD informally targeted.  Additionally, these statistics also demonstrate that the SJPD's

10  motive in employing excessive force was to silence the protestors for speaking out on a topic

11  that, although true, cast them in a negative light.  Certainly, the SJPD would not want public

12  attention to be drawn to the fact that its department was plagued by decades of discrimination.

13      These studies also support *Monell* liability as to a failure to train or supervise.  The

14  statistics establish the existence of the problem, the City's notice thereof, and the City's

15  subsequent inaction or inadequate response.  *See* ECF 73, ¶ 66.  The SAC alleges a nearly 30-

16  year period where the City was aware of this issue and failed to address it.  *Id.*  As early as 1991,

17  the City was put on notice that its police officers were targeting people of color at "high rates

18  relative to the census population of the City."  *Id.*  In 2017, the City was, again, made aware that

19  this issue continued to persist.  *Id.*  Data from 2018 shows that nothing changed thereafter.  *Id.*

20  Indeed, such targeting continued up through the 2020 protests.  *Id.*

21      **c.    Ratification or Decision by Policymaker**

22      "A municipality also can be liable for an isolated constitutional violation if the final

23  policymaker 'ratified' a subordinate's actions."  *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir.

24  _____

25  [4] Johnson is not precluded from making this argument and does reserve the right to later amend

26  to add an equal protection claim in the first instance.

27  [5] The allegations include statistics which show this custom persisted up through the protests

28  themselves.

1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  The allegations in the SAC support the inference that the SJPD's indiscriminate firing of projectiles and tear gas at the protestors assembled at City Hall on May 30 was a deliberate decision by City policymakers or was, at least, ratified by them.  *See* ECF 73, ¶¶ 24-37.  This is because it can be presumed that Chief Garcia, and/or other policymakers, were in control of the department given that they were responding to a massive citywide event requiring the department's full attention.  *See Id.*, ¶¶ 2, 12-59; *Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 749–50 (N.D. Cal. 2020).

"[W]hen [a police] department is executing an organized, department-wide response, one can presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates." *Martinez, supra*, 499 F. Supp. 3d at 750 (citing, e.g, *Christie*, 176 F. 3d at 1239; *Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 979-80 (N.D. Cal. 2017), *affirmed in part, dismissed in part*, 897 F.3d 1125 (9th Cir. 2018); *Dorger v. City of Napa*, 2012 WL 3791447, at *6 (N.D. Cal. Aug. 31, 2012)); accord *NAACP of San Jose/Silicon Valley*, 562 F. Supp. 3d at 397–98; *Sanderlin,* 2022 WL 913055, at *16; *see also Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022) (*Monell* ratification claim pleaded, based on tacit authorization, where complaint alleged protestors were peaceful, sheriff had been supervising protests, and sheriff defended excessive force used against protestors).

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss should be denied.  If the Court finds the allegations in support of any claim insufficient, plaintiff seeks leave to amend.  *See Algzaly v. Pompeo*, No. 20-cv-03322-JCS, 2021 WL 175875, at *5 (N.D. Cal. Jan. 19, 2021).

Dated:  September 27, 2022                                         McMANIS FAULKNER


                                                                           /s/ *Evan Miller*
                                                                           EVAN MILLER
                                                                           Attorneys for Plaintiff