United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| KYLE JOHNSON,<br><br>        Plaintiff,<br><br>   v.<br><br>CITY OF SAN JOSE, et al.,<br><br>        Defendants. | Case No. 21-cv-01849-BLF<br><br>**ORDER DENYING PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

Plaintiff Kyle Johnson alleges that he was seriously injured when Officer James Adgar of the San Jose Police Department fired a less lethal projectile weapon at him during the George Floyd protests in San Jose, California on May 30, 2020. Johnson brings his lawsuit against the City of San Jose ("the City"), Officer Adgar, and other unnamed police officers, asserting claims for battery and negligence and violations of 42 U.S.C. § 1983 and the California Bane Act. Defendants moved to dismiss the first amendment claim against Officer Adgar and the 42 U.S.C. § 1983 claim against the City. ECF No. 74 ("MTD"); *see also* ECF No. 80 ("Reply"). Johnson opposes the motion. ECF No. 79 ("Opp."). The Court held a hearing on the motion on December 1, 2022. For the reasons stated on the record and explained below, the motion is DENIED.

**I.    BACKGROUND**

    **A.    Protests in San Jose**

Following the May 25, 2020 killing of George Floyd by Minneapolis police officer Derek Chauvin, there were nationwide protests against the disproportionate use of deadly force by law enforcement against Black people. ECF No. 73 ("SAC") ¶ 1. And San Jose was no exception. Beginning on May 29, 2020, there were five days of protests against police brutality and systemic racism in San Jose. *Id.* ¶¶ 12-13. As alleged in the SAC, the demonstrators exhibited peaceful

behavior, and police officers responded by shooting impact munitions and chemical weapons at them. *Id.* ¶ 15. On May 29, 2020, peaceful protestors gathered around 2:00 p.m. in downtown San Jose. *Id.* ¶ 16. Officers from the San Jose Police Department ("SJPD") arrived in riot gear with less lethal weapons (40mm projectile impact weapons that do not contain chemical agents) and announced an unlawful assembly. *Id.* ¶¶ 16-17.

Plaintiff alleges that SJPD had only one Long Range Acoustic Device to make announcements; that demonstrators were unaware of dispersal orders; and that SJPD officers were not properly trained on how to give warnings to put demonstrators on notice. SAC ¶ 18. During the course of the protests, the City "authorized or ordered the use of 'kettling,'" a containment tactic, by which SJPD officers formed police lines and drove vehicles towards demonstrators to "herd[]" them in a certain direction. *Id.* ¶ 19. Further, SJPD officers used less lethal force such as tear gas, batons, rubber bullets, bean bags, and physical force, including thirty-one pepper ball projectiles, thirty-two tear gas canisters, and at least 400 foam batons or rubber bullets. *Id.* ¶¶ 20-21. SJPD depleted its stock of less lethal weapons and chemical agents after the first day of protests, and they had to make "emergency purchases" to replenish. *Id.* ¶ 21; *see also* ¶ 58.

A September 2020 After Action Report from SJPD stated there was a "lack of training and experience, insufficient staffing levels, and a need to update policies and procedures." SAC ¶ 22. Further, the City's Independent After Action Report, published in October 2021, identified "the same Department-wide training deficiencies in the realm of crowd control and civil disorder." *Id.* ¶ 23. It stated that most officers and sergeants had not received appropriate training. *Id.*

### B. Johnson's Experience

On the night of May 30, 2020, Plaintiff Kyle Johnson participated in protests near San Jose City Hall in the aftermath the killing of George Floyd in Minneapolis, Minnesota. SAC ¶ 24. Johnson alleges that on that day, there was no curfew in place in San Jose and that city policy prohibited the use of less lethal weapons for crowd control purposes. *Id.* ¶¶ 26-27.

Johnson was protesting near "the planters lining the sidewalk of East Santa Clara Street" in front of the plaza of City Hall. SAC ¶ 28. Officer Adgar was standing with other officers on East Santa Clara Street, and he was equipped with a 40mm launcher and zip ties. *Id.* Officers on East

Santa Clara Street began to deploy their weapons, including less lethal weapons, after an unidentified member of the crowd threw a plastic water bottle up in the air (which landed on the ground without hitting any officers). *Id.* ¶ 29.  In an attempt to flee from the use of these weapons, Johnson ran perpendicular from the officers' advance and towards City Hall. *Id.*  As Johnson attempted to flee, Officer Adgar "aimed and intentionally fired" a 40mm foam baton projectile towards him. *Id.*  Johnson heard a noise that sounded like compressed air and felt the projectile strike the back of his leg as he was in the City Hall plaza. *Id.*  The projectile impact left a large circular-shaped injury on Johnson's leg. *Id.*  After Johnson was hit, he hobbled out of the line of fire towards City Hall and limped away from the demonstrations. *Id.* ¶ 30. As he did so, Johnson heard tear gas being deployed and the police making an announcement that the demonstration was unlawful. *Id.* ¶ 31.  Johnson did not hear any order to disperse or declaration of an unlawful assembly prior to being hit. *Id.*  Johnson was never charged with a crime in connection with demonstrating on May 30, 2020. *Id.* ¶ 32.

The projectile caused "a large circular mark and severe bruising" on Johnson's leg.  SAC ¶ 35.  A blood clot formed, requiring Johnson to make multiple trips to the emergency room and undergo "a sustained course of follow-up treatment," including medication. *Id.*  Johnson's risk of blood clots has increased, and he continues to experience them. *Id.*  He anticipates he will have to take medication to counteract the blood clots for the rest of his life. *Id.*  The injury has also severely impaired Johnson's mobility.  While he was previously an active, athletic person who taught physical education and coached sports, for three months after the incident he was unable to walk or exercise normally. *Id.* ¶ 36.  He continues to suffer pain, reduced mobility, and mental and emotional distress from the impact of the projectile and his treatment experience. *Id.* ¶ 36-37.

### C. Officer Adgar's Actions

Johnson alleges that Officer Adgar "employed excessive force as a result of his discriminatory views towards the demonstrators and his disagreement with the protest."  SAC ¶ 33. Johnson alleges that Officer Adgar fired his projectile weapon at an already-fleeing crowd despite SJPD policy to only use projectile weapons when objectively reasonable to prevent bodily injury. *Id.* ¶ 33(a).  In one instance, Officer Adgar fired a 40mm foam baton at a suspect who had

3

previously thrown a bottle as that individual was trying to flee. *Id.* Similarly, Officer Adgar fired two 40mm projectile rounds at a woman leaving the City Hall area who other officers claimed had previously thrown a bottle. *Id.* Further, Johnson was shot from behind as he was leaving, and thus did not pose a threat of bodily injury to Officer Adgar. *Id.* ¶ 33(b).

Similarly, Johnson alleges that Officer Adgar violated SJPD policy to only fire a projectile weapon when he had identified a target, as body worn camera footage shows he told other officers he could not see where he was firing. SAC ¶ 33(c). Further, SJPD policy indicates officers should not use projectile weapons unless there are sufficient other officers present to take control and custody of the suspect, and Officer Adgar used a projectile weapon despite not being able to arrest any individual on whom he used it. *Id.* ¶ 33(d). Johnson also alleges that Officer Adgar did not receive training from SJPD on the use of Combined Tactical Systems (CTS) projectiles, which includes the CTS 40mm foam round baton, in the five years proceeding these protests. *Id.* ¶ 34.

### D. San Jose Police Department Customs, Policies, Practices, Training, and Supervision

Johnson alleges that the City had crowd control customs, policies, and practices, including the use of projectile weapons and kettling, that were likely to result in the deprivation of constitutional rights. SAC ¶ 38. First, in October 2018, the police chief issued a memo changing SJPD policy such that projectile impact weapons no longer had to be used "as a defensive weapon," but instead could be used "'when objectively reasonable' to incapacitate an armed suspect who is likely to cause serious bodily injury or death." *Id.* ¶ 38(a). On May 22, 2020, one week before the protests, the police chief revised the Duty Manual on the use of projectile impact weapons and crowd control such that "the policy now allowed 40mm projectile weapons in crowd control situations when they had previously been prohibited." *Id.* ¶ 38(b). Johnson alleges that SJPD policy allowed for indirect fired munitions and multi-target munitions. *Id.* ¶ 38(c)-(d). Further, SJPD policy authorized the use of kettling as a crowd control tactic, which Johnson alleges SJPD implemented by forming a police line in front of City Hall. *Id.* ¶ 38(e)-(f).

Johnson alleges that as of the protests, the City's training of officers regarding crowd control, and in particular the use of less lethal weapons, had been "minimal and infrequent." SAC

4

¶ 40.  The City had not conducted any ongoing training for patrol officers on the use of 40mm launchers.  *Id.* ¶ 41.  SJPD also did not provide regular trainings on crowd control.  *Id.* ¶ 42.  In spite of this lack of training, the City and the police department allowed untrained officers to be equipped with less lethal firearms in their response to the protests.  *Id.* ¶ 43.  Officer Adgar received no training on the use of less lethal weapons in the crowd control context in the five years preceding the May 30, 2020 protests.  *Id.* ¶ 44.  An attendance list from SJPD listing all officers who were trained to use 40mm munitions did not include Officer Adgar or Officer Yuen, another officer who was deployed with 40mm munitions during the protests.  *Id.* ¶ 45.

To the extent training was offered, Johnson alleges that it was constitutionally inadequate.  SAC ¶ 46.  For example, a slide deck prepared by Sergeant Christopher Sciba, a nonparty City police officer, says that projectile impact weapons could be used for "Riot/Crowd Control," but does not provide guidance about the circumstances under which use of projectile impact weapons would be permitted by City policy or the Constitution.  *Id.* ¶ 46(a).  The slides acknowledge that "[i]njury should be expected" and depict shots to the chest, spine, head, and neck as "lethal force." *Id.*  The slide urges trainees to "not hesitate" and "[a]ways win."  *Id.* ¶ 46(c).

Johnson also alleges that the City was aware of the SJPD officers' actions during the protests.  SAC ¶ 48.  Johnson alleges that there were images and video footage on social media and news media reports showing that SJPD officers were using less lethal weapons to suppress the demonstrations, as opposed to using them to defend against imminent harm or prevent property damage; that SJPD officers were improperly using their less lethal weapons against SJPD policy; and that SJPD officers were using improper crowd control tactics.  *Id.* ¶ 49.  For example, on May 29, several local live news broadcasts showed real-time footage of SJPD officers "indiscriminately firing projectiles at peaceful protestors" at close range and not making any arrest attempts.  *Id.* ¶ 49(a).  During the CBS KPIX5 broadcast at 6:00 p.m. on May 29, a reporter appeared to have been shot by an SJPD projectile and stated he had been hit with something.  *Id.* ¶ 49(b).  San Jose Mayor Liccardo was on a 5:00 p.m. broadcast on KTVU Fox 2 on May 29 and was asked to respond to the live footage of SJPD officers using less lethal weapons; he also stated he had just been on the phone with then-Police Chief Edgardo Garcia who told him less lethal firearms were

being used near City Hall. *Id.* On another media appearance, the mayor stated that he was observing the protests from his office and they were peaceful. *Id.*

Johnson notes that SJPD was aware of the behavior of Officer Yuen, a video of whom was taken on May 29 and circulated on social media. SAC ¶¶ 50-51. The video showed him "behaving aggressively, yelling obscenities at demonstrators, and firing his less lethal firearm in a reckless manner." *Id.* ¶ 50. He fired about 100 40mm projectiles on May 29, and SJPD received over 1,000 complaints about his conduct at the protest. *Id.* ¶¶ 52-53. On May 31, the police chief responded by stating that he was "a good kid" who had made a "mistake." *Id.* ¶ 51.

Johnson also alleges that a "good Samaritan" helping when an officer was knocked unconscious was later shot in the abdomen with a projectile weapon and another peaceful demonstrator was struck in the genitals with a projectile. SAC ¶ 55. Another woman who was recording the police in her home and yelling at them for their treatment of the protestors had at least thirteen projectiles fired into her apartment through the living room and bedroom windows by SJPD officers, and SJPD officers threw a tear gas canister into her apartment. *Id.* ¶ 56.

As stated above, Johnson alleges that SJPD depleted its stock of less-lethal weapons and chemical agents after the first day of protests, and they had to make an "emergency purchase," even though they had made only 18 arrests. SAC ¶ 58. Furthermore, the City is not able to quantify the true number of less lethal munitions used during the George Floyd protests because officers improperly counted the number of rounds used, in violation of the San Jose Police Department's duty manual. *Id.* ¶ 59.

Johnson alleges that the number of SJPD officers that receive complaints of excessive force and the number of use of force complaints have not improved over time. SAC ¶ 57. Johnson also alleges that SJPD has a custom or practice of unconstitutional policing and discrimination towards people of color. *Id.* ¶ 67. An SJPD After Action report indicated that over 75% of the arrests related to the demonstrations were of people of color. *Id.* ¶ 65. Johnson points to several other studies showing that, over the past three decades, SJPD has disproportionately stopped, arrested, and cited the Black population. *Id.* ¶ 66.

### E. San Jose Police Department Officers' Opinions on Protestors

Johnson alleges that some members and former members of the City police department are "openly hostile" to the Black Lives Matter movement "or others who advocate for the eradication of anti-Black racism in law enforcement." SAC ¶ 60. Johnson alleges that multiple officers—none of them parties here—have made remarks critical of the movement. One commented on Facebook that "black lives don't really matter." *Id.* Another was fired (but later reinstated) after he tweeted, "Threaten me or my family and I will use my God given and law appointed right and duty to kill you. #CopLivesMatter" and "By the way if anyone feels they can't breathe or their lives matter, I'll be at the movies tonight, off duty, carrying my gun." *Id.* The San Jose Police Officers Association also allegedly posted a video that ended with the phrases "All Lives Matter" and "Blue Lives Matter," phrases which Johnson alleges have been created to undermine the Black Lives Matter movement. *Id.* ¶ 61.

### F. This Lawsuit

Johnson filed this lawsuit on March 16, 2021 against Officer Adgar, the City, and Doe defendants. ECF No. 1. Defendants filed a motion to dismiss the First Amended Complaint, which the Court granted in part and denied in part. *See* ECF No. 67. On July 14, 2022, Johnson filed the Second Amended Complaint. *See* SAC. Johnson asserts two claims under 42 U.S.C. § 1983 against Officer Adgar and the City—one for violation of the Fourth Amendment for a seizure accomplished through excessive force and the second for violation of the First Amendment for retaliatory use of force. *See id.* ¶¶ 68–82. Johnson also asserts claims against Officer Adgar and the City for violation of the Bane Act, Cal. Civ. Code §§ 52.1, 52; battery; and negligence. *Id.* ¶¶ 83–98. Johnson requests general and special damages; civil penalties and statutory damages under the Bane Act; punitive damages; pre- and post-judgment interest; attorneys' fees; and costs of suit. *Id.* at "Prayer for Relief". Defendants now seek to dismiss two claims: (1) the Section 1983 claim against Officer Adgar for violation of the First Amendment for retaliatory use of force and (2) the Section 1983 claims against the City. *See* MTD.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

### III.  DISCUSSION

The Court evaluates the two claims challenged by Defendants in the second motion to dismiss: (1) Johnson's Section 1983 claim against Officer Adgar for First Amendment violations and (2) Johnson's Section 1983 claims against the City.

#### A.  Claim 2 – § 1983 / First Amendment (Officer Adgar)

Johnson's second claim against Officer Adgar is a § 1983 claim for retaliatory use of force under the First Amendment. SAC ¶¶ 74–82. To succeed on a First Amendment retaliation claim, Johnson is required to show (1) he was engaged in a constitutionally protected activity, (2) Officer Adgar's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity," and (3) "the protected activity was a substantial or motivating factor in [Officer Adgar's] conduct." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). The Court finds the claim has been adequately pled.

1    Officer Adgar contests the third prong—whether Johnson's protected conduct was a
2    "substantial or motivating factor" in his response. MTD at 4-7. This element "may be met with
3    either direct or circumstantial evidence" and often "involves questions of fact that normally should
4    be left for trial." *Id.* at 827 (citing *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th
5    Cir. 2002)). Johnson has "pleaded adequate facts supporting an inference that the widespread use
6    of force against mostly peaceful protestors was aimed at 'intimidating protestors to deter [their]
7    speech,' which was anti-police in focus." *See Sanderlin v. City of San Jose*, No. 20-cv-04824-
8    BLF, 2022 WL 913055, at *7 (N.D. Cal. Mar. 29, 2022) (quoting *NAACP of San Jose/Silicon
9    Valley v. City of San Jose*, 562 F. Supp. 3d 382, 399 (N.D. Cal. 2021)); *see also Anti Police-
10   Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020) (inference
11   warranted from allegations of "aggressive conduct" by officers, including "shooting a reporter
12   with a rubber bullet"); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155-56
13   (D. Or. 2020) (inference warranted from allegations that "officers indiscriminately used force
14   against peaceful protestors on multiple occasions," "fire[d] tear gas canisters as people attempted
15   to leave the protest area," and subjected protestors to "rubber bullets, tear gas, and a flash bang
16   grenade at close range . . . as [they tried] to comply with officers' orders"); *Black Lives Matter
17   Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020) (inference
18   warranted from use of "indiscriminate weapons" against all protestors and "excessive amount" of
19   chemical agents).
20   Johnson alleges that Officer Adgar "aimed and intentionally fired" a 40mm foam baton
21   projectile towards Johnson while Johnson was attempting to flee from the officers. SAC ¶ 29. In
22   the SAC, Johnson added allegations about the protests more generally, which show a "widespread
23   use of force against mostly peaceful protestors." *See Sanderlin*, 2022 WL 913055, at *7. For
24   example, Johnson has alleged that during the course of the response on May 29, SJPD officers
25   used less lethal force including tear gas, batons, rubber bullets, bean bags, and physical force,
26   including thirty-one pepper ball projectiles, thirty-two tear gas cannisters, and at least 400 foam
27   batons or rubber bullets. *Id.* ¶¶ 20-21. In fact, SJPD depleted its stock of less lethal weapons and
28   chemical agents after the first day of protests, and they had to make "emergency purchases" to

9

replenish. *Id.* ¶ 21; *see also* ¶ 58. And Johnson alleges the use of tear gas and other less lethal weapons by SJPD officers against peaceful protestors. *See, e.g., id.* ¶¶ 15, 17, 20-21, 29, 31, 33, 49, 50, 55-56. These allegations, taken as a whole, plausibly establish that the protestors' protected First Amendment activity was a substantial or motivating factor in Defendants' conduct, and the claims are thus adequately pled.

"As other district courts have noted, given that the protestors were specifically protesting police misconduct, it is reasonable to allege that the protestors' viewpoint was a substantial or motivating cause – even if not necessarily the sole cause – behind the defendants' conduct." *NAACP*, 562 F. Supp. 3d at 399-400. Based on the alleged facts, Officer Adgar's motion to dismiss Johnson's § 1983 claim asserting violations of the First Amendment is DENIED.

### B. Claims 1 and 2 – *Monell* (City of San Jose)

Johnson's first two claims under § 1983 are also asserted against the City based on liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). "The Supreme Court in *Monell* held that municipalities may only be held liable under section 1983 for constitutional violations resulting from official [municipal] policy or custom." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Monell*, 436 U.S. at 694). "[P]olicies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and, in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality[.]" *Id.* (internal citations omitted); *see also Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019) ("In particular, municipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker."). "A municipality may [also] be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to

10

deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alterations in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)). Johnson asserts that his claims against the City are based on a custom or practice; failure to train, supervise, or discipline; and ratification. Opp. at 14-27.

### 1. Custom or Practice

A municipality may be held liable on the basis of an unconstitutional policy if a plaintiff can "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents"—rather, "[t]he custom must be so persistent and widespread that it constitutes a permanent and well settled city policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (internal quotation marks and citations omitted). To withstand a motion to dismiss for failure to state a claim, a *Monell* claim must consist of more than mere "formulaic recitations of the existence of unlawful policies, customs, or habits." *Warner v. Cnty. of San Diego*, No. 10-cv-1057 BTM(BLM), 2011 WL 662993, at *4 (S.D. Cal. Feb. 14, 2011).

Johnson argues that the City has "an unwritten custom or practice of using excessive force, including the use of projectile weapons, tear gas, and kettling, with little or no warning against people participating in protests against the racist killings of Black people by police officers." Opp. at 15. The City argues that Johnson cannot show a "permanent," "longstanding," or "well settled" practice because his allegations are all regarding one single protest. Reply at 4-8. The City argues that Johnson must provide "more than allegations of contemporaneous or near contemporaneous conduct" to support a *Monell* custom or practice claim. *Id.* at 7-8.

Johnson points to several cases from other district courts across the country addressing this same issue in the context of the May 2020 police brutality protests. Opp. at 17-19. In *Samaha v. City of Minneapolis*, plaintiffs' allegations of "incidents of excessive force against peaceful protestors on each day of the protests, by numerous MPD officers, and at several locations across

the city" were sufficient to plead an unconstitutional custom under *Monell*. 525 F. Supp. 3d 933, 941-42 (D. Minn. 2021). The court noted that the plaintiffs alleged "similar misconduct occurring on different days and in different places, by many different MPD officers, during the George Floyd protests." *Id.* at 942. The court recognized that the alleged incidents were "condensed into a relatively short period in May 2020," but found that there was a "reasonable inference that the time period was sufficiently long for the City Defendants to take notice of the MPD officers' alleged misconduct and change course." *Id.* In *Tirado v. City of Minneapolis*, the court determined that the approximately ten incidents of misconduct alleged by the plaintiff were sufficient to plead a custom or policy, even though they all took place over the course of the protests. 521 F. Supp. 3d 833, 842-43 (D. Minn. 2021). In analyzing the time frame, the court noted that even though the timeframe was isolated, plaintiff had alleged it was long enough that the City was on notice of the practice. *Id.* at 843. And in *Huffman v. City of Boston*, the court decided that plaintiffs had sufficiently pleaded a custom of excessive force based on their allegations of unreasonable force on May 29 and 31, 2020. No. 21-cv-10986-ADB, 2022 WL 2308937, at *7 (D. Mass. June 27, 2022).

The City points to two cases from the Southern District of California. Reply at 6-7. In *Bidwell v. County of San Diego*, the court looked at whether the municipal defendants had "a pattern and practice of declaring peaceful assemblies to be unlawful based on their own convenience." --- F.3d ---, 2022 WL 2135002, at *13 (S.D. Cal. June 14, 2022). Plaintiffs alleged three different unlawful assembly declarations during a days-long protest in 2016, and the court determined this was insufficient. *Id.* First, the court noted that plaintiffs did not dispute there was "some basis" for each declaration. *Id.* The court further stated that "the fact that three unlawful assembly declarations occurred over the span of a four-day time period during a weeks-long demonstration of varying sizes and characteristic is not" sufficient under *Monell*. *Id.* And in *Lien v. City of San Diego*, the court decided whether the municipal defendant had "a policy of anti-Trump viewpoint discrimination." No. 21-cv-224-MMA (WVG), 2021 WL 2072385, at *4 (S.D. Cal. May 24, 2021). Plaintiffs pointed to similar anti-Trump viewpoint discrimination at two previous events: a Trump rally and Women's march. *Id.* at *3. The court determined that "[a]s

12

1  currently pleaded, Plaintiffs' proffered two prior incidents are insufficient to state a plausible
2  longstanding custom." *Id.* at *5.

3  The Court also finds instructive the Ninth Circuit's decision in *Menotti v. City of Seattle*. 409 F.3d 1113 (9th Cir. 2005). In that case, the plaintiffs challenged the city's actions in issuing an emergency order prohibiting access to portions of downtown Seattle during the 1999 World Trade Organization conference. *Id.* at 1117. The plaintiffs, who were protesting the WTO conference, were all arrested under the order. *Id.* at 1118. The court evaluated whether the city of Seattle was liable under *Monell* for the actions of police officers who had arrested protestors without determining whether they were subject to an exemption in the emergency order. *Id.* at 1146-47. The Ninth Circuit recognized it had "held that a municipal policy 'may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Id.* at 1147 (quoting *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 934, 929 (9th Cir. 2001)). Five individuals submitted declarations that they had been improperly refused entry into a restricted zone unless they removed anti-WTO buttons or stickers; all of the incidents took place on December 1, 1999. *Id.* at 1147-48. Based on these five declarations, along with "the absence of evidence that police officers were discharged or reprimanded" for engaging in this behavior, the Ninth Circuit reversed the district court's grant of summary judgment for the City. *Id.* at 1148.

First, looking to the decisions in *Samaha*, *Tirado*, and *Huffman*, the Court declines to decide that the allegations were over too short a timeframe so as to justify dismissing the policy/custom theory at this stage. Further, the Court notes that under *Menotti*, it can rely on "repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded" to find a custom or policy. 409 F.3d at 1147. Johnson alleged a failure to reprimand at least one police officer for his actions in the protests. *See* SAC ¶¶ 50-51. These allegations, taken as a whole, allow the Court to reasonably infer a custom or policy.

### 2. Failure to Train, Supervise, or Discipline

"[F]ailure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of

13

persons with whom the employee comes into contact." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389. And only under such circumstances does the failure to train constitute "a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* at 390. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). As such, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. But a plaintiff can show a failure to train "without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long*, 442 F.3d at 1186 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). Similarly, a constitutional violation may arise from a failure to supervise when "the supervision is sufficiently inadequate as to constitute 'deliberate indifference' to the rights [sic] of persons with whom the police come into contact." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).

The Court finds that Johnson has made out a failure to train claim based on the change in policy immediately before the protest regarding the permissible uses of less lethal weapons. *See Sanderlin*, 2022 WL 913055, at *15. He alleges that one week before the protest, the police chief sent a memo to all SJPD personnel informing them that the Duty Manual had been revised to permit the use of less lethal weapons for crowd control purposes, a context in which those weapons were previously prohibited. SAC ¶ 38(b). Johnson also alleges that while there had been some training on crowd control and the use of less lethal weapons generally, it was not conducted with sufficient frequency, several officers had not received the training, and there was no training

14

on the legally permissible uses of less lethal firearms in a crowd control context in at least the previous five years. *Id.* ¶¶ 40-45. While failure to train claims are the "most tenuous" form of *Monell* liability, *Connick*, 563 U.S. at 61, the Court finds that the allegations are sufficient to state a failure to train claim. *See Sanderlin*, 2022 WL 913055, at *15. Without training on how to use less lethal weapons in a crowd control situation, Johnson has pled that the City was deliberately indifferent to his constitutional rights by changing the policy to allow for such uses of less lethal weapons. *See id.*

The Court also finds that Johnson has adequately alleged that SJPD's failure to supervise the police officers during the protests constituted deliberate indifference. Johnson has alleged that SJPD was aware of the officers' conduct during the protests, *see* SAC ¶¶ 48-51, and did nothing to change course. Further, Johnson alleged that SJPD went so far as to replenish the stock of less lethal weapons midway through the protest, after a very large amount were used, yet failed to direct the officers to change their behavior. *Id.* ¶¶ 20-21, 58. This behavior creates a reasonable inference of a deliberate indifference by SJPD as to the rights of the protestors.

Johnson also asserts a failure to discipline. The Ninth Circuit has held that "a custom or practice can be 'inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233-34 (9th Cir. 2011) (quoting *Nadell*, 268 F.3d at 929). As discussed above, the Court considered SJPD's failure to discipline its employees in evaluating the custom or policy claim.

### 3. Ratification

"A municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it." *Id.* (internal quotation marks and citation omitted). The policymaker must have knowledge of the constitutional violation and actually approve of it—a failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim. *Id.* In other words, ratification requires an authorized policymaker to make a "conscious,

15

affirmative choice" to endorse a subordinate's actions. *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992). A policymaker's after-the-fact approval of a subordinate's conduct that caused the alleged constitutional violations may be used as evidence that a municipality had a pre-existing policy that caused the alleged constitutional violations. *Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020). To show that ratification was a "moving force" behind the constitutional deprivation, a plaintiff must demonstrate both causation in fact and proximate causation. *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011).

Another court, in evaluating *Monell* liability in the context of similar Black Lives Matter protests, stated that "when [a police] department is executing an organized, department-wide response, one can presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates." *Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 750 (N.D. Cal. 2020). In such an instance "it becomes easier to infer that the repeated conduct of individual police officers is really the conduct of the department." *Id.* (collecting cases). Here, the facts alleged in the SAC suggest that SJPD was engaged in "an organized, department-wide response." *See* SAC. In such an instance, the Court can infer ratification by the Department. *See Martinez*, 499 F. Supp. 3d at 750; *see also Sanderlin*, 2022 WL 913055, at *16.

\* \* \*

Defendants' motion to dismiss the *Monell* claims (claims 1-2 against the City) is DENIED.

IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that the motion is DENIED.

Dated: December 12, 2022

_____
BETH LABSON FREEMAN
United States District Judge