UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE JOHNSON,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF SAN JOSE, et al.,<br><br>    Defendants. | Case No. 21-cv-01849-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'** ***DAUBERT*** **MOTIONS TO EXCLUDE EXPERT TESTIMONY OF ROGER CLARK AND DR. HARLAN WATKINS**<br><br>Re: ECF Nos. 110, 112 |

Pending before the Court are two motions (the "Motions") filed by Defendants City of San Jose (the "City") and Officer James Adgar ("Officer Adgar," and with the City, "Defendants") to exclude expert testimony of Plaintiff Kyle Johnson's ("Mr. Johnson") experts Roger Clark and Dr. Harlan Watkins. *See* Mot. Exclude Testimony of Pl.'s Expert Roger Clark ("Clark Mot."), ECF No. 110; Mot. Exclude Testimony of Pl.'s Expert Dr. Harlan Watkins ("Watkins Mot."), ECF No. 112. The Court heard oral argument on the Motions on December 14, 2023. Having considered the relevant law and the parties' written submissions and oral arguments, the Court GRANTS IN PART and DENIES IN PART each Motion.

## I.    BACKGROUND

The nation saw a wave of public demonstrations protesting police brutality toward Black people following the May 25, 2020 killing of George Floyd by Minneapolis police officers. Mr. Johnson attended one such protest on the evening of May 30, 2020 in San Jose, California. While at the protest, Mr. Johnson was struck in the back of his left knee by what he alleges was a 40mm projectile impact weapon ("PIW") fired by Officer Adgar. Mr. Johnson later filed this suit, in which he asserts that Defendants' actions in connection with the protest violated his rights under the First and Fourth Amendments of the United States Constitution, as well as California statutory

and common law. *See* Second Am. Compl. ("SAC") ¶¶ 68–98, ECF No. 73. Mr. Johnson seeks general, special, statutory, and punitive damages, as well as civil penalties, pre-judgment and post-judgment interest, attorneys' fees, and costs of suit. *See id.* at Prayer for Relief.

Trial is currently set for December 2, 2024. *See* ECF No. 149. Defendants timely brought the Motions so that they were heard at least 60 days before trial. *See* Standing Order Re Civil Cases § IV(A)(2).

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides that a witness may testify as an expert if the district court is satisfied that "it is more likely than not" that:

> (a) the [witness's] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. An expert may be qualified as such "by knowledge, skill, experience, training, or education." *Id.* The Court notes that the current text of Rule 702 is the result of a recent amendment—effective as of December 1, 2023—that was made "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Accordingly, district courts are subject to a "basic gatekeeping obligation" to ensure that any testimony admitted from a qualified expert is "not only 'relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). The Court has broad discretion concerning the admissibility or exclusion of expert testimony. *Wood v. Stihl, Inc.*, 705 F.2d 1101, 1104 (9th Cir. 1983); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("*Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their

gatekeeping function.") (citation omitted).

The issue of relevance is encapsulated in Rule 702(a)'s requirement that the expert's specialized knowledge "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation omitted). The issue of reliability "probes 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Murray v. S. Route Maritime SA*, 870 F.3d 915, 922 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 592–93). Courts generally conduct a four-factor inquiry in determining reliability, examining: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Id.* (citing *Daubert*, 509 U.S. at 593–94). However, the question of reliability requires a "flexible" inquiry, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 526 U.S. at 153 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)). A district court has "the same broad latitude . . . [to] decide[] *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142.

For example, "because 'medical knowledge is often uncertain,'" a court "'should admit medical expert testimony if physicians would accept it as useful and reliable,'" so long as the "foundation is sufficient." *Primiano v. Cook*, 598 F.3d 558, 565–66 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006)). And where the reliability of non-scientific testimony is at issue, the Ninth Circuit has recognized that "the '*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it.'" *Hangarter*, 373 F.3d at 1017 (citation omitted); *see also Kumho Tire*, 526 U.S. at 150 ("[T]he relevant reliability concerns may focus upon *personal knowledge or experience*.").

3

## III. DISCUSSION

Defendants seek to exclude the expert testimony of Roger Clark and Dr. Harlan Watkins. The Court addresses the testimony of each expert in turn.

### A. Expert Testimony of Roger Clark

Defendants request that the Court exclude any testimony from Roger Clark—who is Mr. Johnson's police practices expert—regarding any of the opinions disclosed in his expert report, on the basis that Mr. Clark does not have the requisite expertise for his opinions and that the opinions therefore either constitute legal conclusions or invade the fact-finding province of the jury. *See generally* Clark Mot. Defendants focus their argument on seven opinions: (1) that video evidence in this action shows that Officer Adgar shot Mr. Johnson; (2) that Officer Adgar intentionally struck Mr. Johnson; (3) that Officer Adgar filed a false police report; (4) that Officer Adgar held a "general animus and apparent discriminatory view" toward protestors; (5) that the San Jose Police Department ("SJPD") lacked adequate policies and training regarding the use of PIWs; (6) that SJPD took "arbitrary and unnecessary actions" with respect to the May 30 protest and expressed a "callous disregard for the lives and safety of the protestors"; and (7) that SJPD "failed to use well-known law enforcement methods" of crowd control. *See id.* at 3–8; *see also* Decl. of Yue-Han Chow ("Chow Decl."), Exh. 1 ("Clark Report"), at 8, 18–20, ECF No. 110-1. Mr. Johnson opposes the motion, arguing that Mr. Clark is allowed to use his own observations of the video evidence as a basis for his opinion, and that his stated opinions are properly based on his review of relevant materials and his experience with police procedures. *See* Pl.'s Opp'n to Clark Mot. ("Clark Opp'n"), ECF No. 130.

#### 1. Interpretation of Video Evidence (Challenged Opinion No. 1)

The Court agrees with Defendants that several of Mr. Clark's opinions, as expressed in his report, are unrelated to the field of Mr. Clark's purported expertise—police practices—and are made with no apparent foundation. For example, Mr. Clark asserts that it is "uncontested" from the video evidence that Officer Adgar "trained his 40mm [PIW] on Mr. Johnson, fired the (target specific) 40mm at Mr. Johnson, and intentionally struck Mr. Johnson," and that Officer Adgar subsequently "violated policy by filing a false police report." Clark Report 10. Nothing before

4

the Court indicates that Mr. Clark is qualified "by knowledge, skill, experience, training, or education" as an expert on video interpretation. Fed. R. Evid. 702. Additionally, the jury does not need the assistance of an expert to tell them what they can see for themselves in the videos. Accordingly, the Court cannot conclude that Mr. Clark's opinions about what the videos display are reliable expert testimony, and therefore will not permit Mr. Clark to testify as an expert about the events depicted in the video evidence. *See Cover v. Windsor Surry Co.*, No. 14-cv-05262, 2017 WL 9837932, at *17 (N.D. Cal. July 24, 2017) ("[Expert's] opinion, which relies on his personal interpretation of [the] marketing materials, falls outside the scope of his expertise as a wood scientist and is not reliable.") (citation omitted); *Mesfun v. Hagos*, No. CV 03-02182, 2005 WL 5956612, at *11 (C.D. Cal. Feb. 16, 2005) ("Moreover, [the expert's] testimony would not assist the trier of fact, as jurors are more than capable of drawing their own conclusions about the evidence presented without the benefit of [the expert's] personal interpretation of it."). This ruling does not preclude Mr. Clark from using the videos as a basis for other opinions or preclude Mr. Johnson from posing hypothetical questions to Mr. Clark regarding the contents of the video evidence—subject to Defendants' objections—but instead precludes Mr. Clark himself from testifying to jury about what can be seen in the videos.

### 2. Officer Adgar's Intentions, Credibility, or State of Mind (Challenged Opinion Nos. 2–4)

Mr. Clark's opinions on the credibility, intentions, or state of mind of Officer Adgar or another individual, *see, e.g.*, Clark Report 8, 10, 17, are likewise inadmissible, as Mr. Clark is not offered as a witness with relevant expertise to make such determinations and those opinions are pure speculation. *See Lanard Toys Ltd. v. Anker Play Prod., LLC*, No. CV 19-4350, 2020 WL 6873647, at *7 (C.D. Cal. Nov. 12, 2020) ("Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind.") (citation and internal quotation marks omitted) (collecting cases). This ruling accordingly precludes Mr. Clark from testifying as to Officer Adgar's alleged animus or intentions, but does not preclude testimony regarding whether Officer Adgar's or other officers' actions comport with professional standards, or testimony based on proper hypothetical questions.

5

### 3. SJPD Training & Policies (Challenged Opinion No. 5)

In the time since the Motions were fully briefed, the Court issued an order granting summary judgment on Mr. Johnson's § 1983 claims against the City based on a *Monell* theory of failure to supervise or train. *See* Order Granting in Part and Denying in Part Defts.' Mot. Summ. J. ("MSJ Order") 24–26, ECF No. 139. Accordingly, Mr. Clark's opinions regarding the adequacy of SJPD's policies and training are no longer relevant and are therefore inadmissible. *See Daubert*, 509 U.S. at 591.

### 4. SJPD's Use of Force & Crowd Control (Challenged Opinion Nos. 6–7)

Defendants object to Mr. Clark's testimony regarding SJPD officers' actions on May 30, including use of force and crowd control tactics, on the grounds that Mr. Clark (1) is insufficiently qualified as an expert in less lethal projectile use and crowd control tactics; (2) has insufficient support for his opinions in light of SJPD policies and the actual events of May 30; and (3) with respect to his assertions that the SJPD "deliberately inflicted significant indiscriminate force" and demonstrated "callous disregard for the lives and safety of the protestors," *see* Clark Report 18–19, makes factual and legal conclusions that only a jury or this Court should reach. *See* Clark Mot. 6–8. Mr. Johnson counters that Mr. Clark is qualified to testify as to whether SJPD officers' actions met police practices standards, that his testimony is the result of his expertise and the record evidence. *See* Clark Opp'n 2, 7–9.

Mr. Clark was a law enforcement officer for 27 years, and since retiring from active service in 1993 has continued to study, research, and present on California Peace Officer Standards and Training (POST). *See* Clark Report 21–23. Further, Mr. Clark has consulted on over 2,300 cases that often involve use of force questions, and has testified on police practices in federal and state courts across the country. *See* Clark Report 21–29. The Court finds that Mr. Clark is well-qualified by virtue of his "knowledge, skill, experience, training, [and] education" to provide an opinion on whether SJPD officers' actions on May 30 comported with Mr. Clark's understanding of police practices. As Defendants note, Mr. Clark is not an expert in less lethal projectiles, including PIWs, or crowd control tactics, and he may not offer testimony as a purported expert on either of these subjects. However, Mr. Clark may testify on these topics to the

extent his testimony is premised on his experience concerning police practice standards. *See Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190, 1197 (C.D. Cal. 2015) ("Thus, Clark may opine on whether tasers may cause bodily injury and when taser deployment is an appropriate use of force—but only to the extent that such testimony is based on Clark's expertise in POST and other law enforcement standards. However, Clark may not testify as to . . . any purported expert knowledge of the taser product.").

Defendants' arguments as to the evidentiary support for Mr. Clark's opinions go to the weight of his testimony, rather than its admissibility. *See S.F. Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1095–96 (N.D. Cal. 2022) ("Furthermore, '[t]he relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility.'") (quoting *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987), *opinion modified on reh'g*, 866 F.2d 318 (9th Cir. 1989)).

Lastly, the Court finds Mr. Clark's opinions that the SJPD "deliberately inflicted significant indiscriminate force" and demonstrated "callous disregard for the lives and safety of the protestors," *see* Clark Report 18–19, to be similar to his opinions regarding Officer Adgar's state of mind and intentions. *See supra*, at Part III(A)(3). Because the essence of these opinions, if not the manner of expression in Mr. Clark's report, may be admissible at trial given proper hypothetical questioning, the Court will once more deny the motion to exclude these opinions without prejudice to Defendants raising the objections at trial. *See In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *2.

### 5. Conclusion Regarding Mr. Clark's Testimony

For the reasons discussed above, the Court will grant in part and deny in part Defendants' motion to preclude Mr. Clark from testifying. Mr. Clark may not testify as to matters relating to SJPD training and policies to the extent such testimony is relevant only to Mr. Johnson's *Monell* claim against the City based on a failure to train and supervise, on which the Court has granted summary judgment. The Court will permit Mr. Clark to testify at trial as to his opinion on SJPD's and Officer Adgar's actions in light of standard police practices based on his experience, the materials he identified in his report, and any evidence elicited at trial. *See* Clark Report 2–4. The

7

Court cautions Mr. Johnson that several of the opinions expressed in Mr. Clark's report are bombastic and made without apparent foundation or relevant expertise, and such opinions will not be admissible at trial. In particular, Mr. Clark may not provide expert testimony as to what the video evidence shows, or as to Officer Adgar's credibility, state of mind, or intentions. Mr. Johnson may pose related hypothetical questions to Mr. Clark, subject to Defendants' objections.

### B. Expert Testimony of Dr. Harlan Watkins

Defendants also move to exclude the following opinion testimony of Mr. Johnson's medical expert, Dr. Harlan Watkins: (1) Defendants caused or contributed to Mr. Johnson's pulmonary embolism in March 2021 through a blood clot originating, forming, or growing in the left leg; (2) Defendants caused a "recurrent" pulmonary embolism or created a "risk factor" to Mr. Johnson's pulmonary embolism in March 2021; (3) Defendants caused any of Mr. Johnson's "chronic" left ankle pain and swelling and related past and future medical care and costs other than from the projectile impact on May 30, 2020, but limited through November 2020; and (4) t is medically necessary for Mr. Johnson to have lifelong anticoagulant treatment, emergency room visits, or hospitalizations. *See* Watkins Mot. 2. Defendants do not challenge Dr. Watkins's qualifications or the relevance of his report, but argue that the challenged opinions are not reliable because Dr. Watkins has not identified a sufficient methodology behind the first three opinions, and the fourth opinion regarding lifelong care is mere speculation. *See id.* at 3–9. Mr. Johnson opposes the motion, arguing that Dr. Watkins has sufficiently explained the bases for his opinions and emphasizing that there is no requirement that a medical expert's testimony be conclusive. *See* Pl.'s Opp'n to Watkins Mot. ("Watkins Opp'n"), ECF No. 129.

Before addressing the challenged opinions, the Court briefly reviews Mr. Johnson's relevant medical history and Dr. Watkins's report.

#### 1. Mr. Johnson's Relevant Medical History

Mr. Johnson is a 29-year-old man. *See* Decl. of James Huang ("Huang Decl."), Exh. B ("Watkins Report") 3,[1] ECF No. 112-1. He was diagnosed with ulcerative colitis ("UC") and non-

---

[1] Page citations to Dr. Watkins's report refer to the numbers in the bolded red footer of the copy of the report attached to the Huang Declaration.

1   compaction cardiomyopathy in 2009. *See id.*

2           On May 30, 2023, Mr. Johnson was hit in the back of his left knee with a rubber bullet bag.
3   *Id.* at 4. He went to the emergency room on June 1, 2020 for the pain in his left knee and was
4   diagnosed with "blunt force trauma," with the injury initially treated as a muscle contusion. *See*
5   *id.* at 4, 23. On June 28, 2020, Mr. Johnson was diagnosed by ultrasound with a provoked deep
6   vein thrombosis (DVT)—*i.e.*, a posttraumatic blood clot—of his left knee. *See id.* at 23, 32. On
7   June 30, 2020, Mr. Johnson had a positive pulmonary CT angiogram, and was thereby diagnosed
8   with a pulmonary embolism. *See id.*; *see also* Huang Decl., Ex. A ("Watkins Dep. Tr.") 50:7–22,
9   ECF No. 112-1. He was placed on a six-month course of taking the anticoagulant medication
10  Praxada at 150mg strength twice a day. *See* Watkins Report 4. Praxada is known to have possible
11  bleeding complications. *See id.* at 22. About three to four months of treatment passed before Mr.
12  Johnson's left leg felt and appeared normal and Mr. Johnson was able to walk without crutches
13  and severe pain. *See id.* at 4. The anticoagulant treatment was discontinued on December 28,
14  2020. *See id.*

15          On March 10, 2021, Mr. Johnson was hospitalized for three to four days due to a c.
16  difficile colitis complicating his ulcerative colitis. *See id.* at 4–5. During this hospitalization, Mr.
17  Johnson was treated for a pulmonary embolism. *See id.* at 5. He was discharged around March
18  14, 2021, and was instructed to take Praxada at 150mg strength twice a day for the rest of his life.
19  *See id.* at 5.

20          Additionally, Mr. Johnson began to have pain in his left ankle two weeks after the injury to
21  his left knee on May 30, 2020. *See* Watkins Report 6. He was prescribed Rivaroxaban at his June
22  28, 2020 appointment, and the pain was resolved shortly thereafter. *See id.* The left ankle pain
23  recurred in November 2022 without any preceding trauma, and has persisted to the present. *See*
24  *id.* He has never had an MRI of the ankle. *See id.*

25          **2.    Dr. Watkins's Report**

26          Dr. Watkins performed an in-person independent medical examination and two psychiatric
27  screenings of Mr. Johnson on July 27, 2021, and a further psychiatric screening of Mr. Johnson on
28  February 25, 2023. *See id.* at 17. He additionally had a phone conference with Mr. Johnson on

March 4, 2023. *See id.* at 14. Further, in 2021 and again in 2023, Dr. Watkins completely reviewed four volumes of Mr. Johnson's medical records, totaling 2,280 pages. *See* Watkins Report 14. After organizing the information, Dr. Watkins used about 360 to 480 pages of these records as the main basis for his medical opinion. *See id.*

      Dr. Watkins's report is divided into multiple sections and supplements thereto. The first, which is dated February 28, 2023, reviews Mr. Johnson's medical history according to Dr. Watkins's discussions with Mr. Johnson and includes the two psychiatric screening reports. *See* Watkins Report 1–13. The second section, dated March 9, 2023, describes the medical records reviewed by Dr. Watkins to inform his opinion, as well as a March 4, 2023 call with Mr. Johnson. *See id.* at 8, 14–16. The third section, also dated March 9, 2023, contains Dr. Watkins's conclusions and a summary of his opinions as to causation and damages. *See id.* at 8, 17–21. This section additionally attaches the abstract and conclusion of an article from the journal "Hematology" that Dr. Watkins opines "describes Mr. Johnson's situation better than I." *See id.* at 17, 20–21.

      Dr. Watkins next provides a March 21, 2023 supplement to the third section of his report, which "estimate[s] [] present and future medical tests and treatments related to injuries resulting from the left lower leg injury of Kyle Johnson on 5/30/2020," and includes a further summary and conclusions. *See id.* at 22–26. The report then includes what appears to be a single page of an online article from Healthline.com. *See id.* at 27. There is then a second supplement to the third section of the report, dated April 20, 2023, which is included "to clarify Mr. Kyle Johnson's future need for emergency department evaluations and hospitalizations on an annual basis." *See* Watkins Report 28–30. This supplement states that, in the words of the "Hematology" article, "[a]nticoagulant drugs are among the drugs most frequently associated with hospital admission for acute or adverse drug reactions." *Id.* at 30. A third supplement, dated April 28, 2023, includes a chart summarizing Mr. Johnson's medical billing records and opines that the medical bills related to Mr. Johnson's injury paid to date is "at minimum" $51,582.07. *Id.* at 31; *see id.* at 31–38.

      Lastly, the report includes a fourth section—although dated March 13, 2023—listing seven articles from various medical journals or sources as "supporting documents," and then includes as

attachments Dr. Watkins's *curriculum vitae*, bibliography, history of depositions and court cases from 2019 to 2022, and medical legal fees. *See id.* at 39–48.

### 3. March 2021 Pulmonary Embolism (Challenged Opinion Nos. 1–2)

Dr. Watkins opines that the "bullet bag projectile that was fired by [SJPD] injured the left posterior leg and caused severe damage," including "recurrence of bilateral pulmonary embolism from DVT in left leg when the anticoagulation therapy was discontinued after six months, now requiring lifelong anticoagulation therapy with all its risks and consequences, but the risk of going without treatment is damaging and potentially fatal." *See* Watkins Report 17–18. Defendants assert that Dr. Watkins hypothesizes that Mr. Johnson's second pulmonary embolism had its "source or origin" in Mr. Johnson's left leg, and that the opinion should be excluded as—at best—a mere plausible hypothesis because Dr. Watkins's deposition testimony indicates that the March 2021 pulmonary embolism could have had several other causes. *See* Watkins Mot. 3–6. Defendants further argue that Dr. Watkins fails to assess the relative risk of various potential contributing factors to the March 2021 embolism, and that this failure renders inadmissible his opinion that the embolism was caused by Mr. Johnson's May 30, 2020 injury. *See id.* at 6–7. Mr. Johnson counters that Defendants are demanding a level of certainty not always possible, especially with medical experts, and argues that Dr. Watkins's extensive experience in the field and the cited medical literature, combined with his review of the medical history and Dr. Watkins's own physical examination of Mr. Johnson, constitute a sufficient methodology for the opinion. *See* Watkins Opp'n 4–5. Mr. Johnson additionally argues that the issues raised in hypotheticals during Dr. Watkins's deposition testimony are an attack on credibility, rather than reliability. *See id.* at 5–7.

The Court is acutely aware of its obligations as a gatekeeper of reliable evidence, particularly following the amendment made to Rule 702 "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. It finds that Dr. Watkins's credentials—over 50 years of practicing as an internist and cardiologist, extensive experience in

11

the use of anticoagulants, and several publications and presentations on relevant topics—qualify him as a medical expert "by knowledge, skill, experience, training, [and] education." Fed. R. Evid. 702; *see* Watkins Report 1–2, 41–46. The Court further finds that Dr. Watkins's specialized knowledge would help a jury understand the evidence—Mr. Johnson's medical history—to determine causation, and that Dr. Watkins has sufficiently indicated the facts and data upon which his opinion rests. *See* Fed. R. Evid. 702(a)–(b); *see, e.g.*, Watkins Report 14–16. Defendants do not challenge Dr. Watkins's expertise or the relevance of his opinions, and do not argue that Dr. Watkins did not review sufficient facts to arrive at his opinions. *See generally* Watkins Mot.

The structure of Dr. Watkins's report is not a model of clarity, but the Court understands its first and second sections—describing Dr. Watkins's conversations with and examinations of Mr. Johnson, as well as his review of the medical records, *see* Watkins Report 1–16—are the basis for the opinions espoused in the third section (including the supplements), *see id.* at 17–38, which are stated as conclusions and then followed by explanations. The challenged conclusion that Defendants caused "[r]ecurrence of bilateral pulmonary embolism from DVT in left leg when the anticoagulation therapy was discontinued after six months," *see* Watkins Report 18, is contained within a subsection that follows a short preamble, in which Dr. Watkins states that an "excellent" article from the journal "Hematology . . . describes Mr. Johnson's situation better than I," *see id.* at 17. The cited article states at the outset that "[t]he majority of patients with venous thromboembolism (VTE) have a considerable long-term risk of recurrence and may require extended duration of anticoagulant treatment after the initial 3 to 6 months." *Id.* at 20. Further, Dr. Watkins repeatedly discusses Mr. Johnson's preexisting diagnoses of ulcerative colitis and non-compaction cardiomyopathy, *see, e.g.*, *id.* at 3, 4, 5, 6, 7, 15, 18, 22, but does not identify them in his report as potential causes of Mr. Johnson's second pulmonary embolism.

Defendants' arguments in support of excluding this Dr. Watkins's opinion on the second pulmonary embolism hinge on the idea that the second pulmonary embolism may have been independently caused by the c. difficile infection, Mr. Johnson's preexisting ulcerative colitis, or a spontaneous clot in the lung (as opposed to in Mr. Johnson's left leg), and that Dr. Watkins has not explained his basis for opining that the May 30, 2020 incident caused the March 2021 pulmonary

embolism.  *See* Watkins Mot. 3–7.  But Defendants appear to misread Dr. Watkins's opinion to assert that the physical impact of the projectile on May 30 was the only link to the second pulmonary embolism.  *See, e.g.*, Defts.' Reply in Supp. of Watkins Mot. ("Watkins Reply") 3 ("(1) Dr. Watkins cites no literature that points to a strong scientific link between patients suffering a second PE [pulmonary embolism] after experiencing a physical impact; and, more crucially (2) he cannot say that even if Plaintiff did not have [ulcerative colitis] or a C. diff. infection, he would have suffered a second PE because of the physical impact.").  But the Court understands Dr. Watkins's opinion to focus on the repercussions of undergoing an initial course of anticoagulants, and then being taken off the medication.  *See* Watkins Report 17–22.  It does not appear from Defendants' excerpted deposition testimony that Dr. Watkins was questioned in a manner that isolated the anticoagulation effects, or ever suggested in his testimony that he had overlooked a wholly independent potential cause for the second pulmonary embolism.  *See, e.g.*, Watkins Dep. Tr. 61:5–6 ("The immunologic response is intimately related to the coagulation system, we know now."); *id.* at 64:12–23 ("If he was a normal person without the ulcerative colitis and he got a C. Diff., yes, that's maximum stimulus to the immune system of the body and that person probably could get it, too, from the immunization process triggering the *coagulation cascade* that we've recognized for decades.") (emphasis added).  In fact, Dr. Watkins appears to opine that the anticoagulation course increased Mr. Johnson's susceptibility to c. difficile.  *See* Watkins Report 18.

Defendants have not submitted other evidence that would inform the Court that Dr. Watkins failed to "adequately account[] for obvious alternative explanations."  Watkins Reply 3 (citing *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)).  The evidence before the Court therefore consists of Dr. Watkins's credentials, his reliance on medical literature about the various effects of a course of anticoagulants, his opinion that Mr. Johnson experienced a "[r]ecurrence of bilateral pulmonary embolism from DVT in left leg *when the anticoagulation therapy was discontinued after six months*," Watkins Report 18 (emphasis added), and his testimony stating that under various circumstances, ulcerative colitis and c. difficile can additionally play a role in pulmonary embolisms.  Under these circumstances, given Dr. Watkins's

education, long expertise with the effects of anticoagulants, and the cited medical literature, the Court finds it more likely than not that Dr. Watkins's challenged opinion—that the second pulmonary embolism, which "[r]ecurre[d] . . . when the anticoagulation therapy was discontinued after six months," Watkins Report 18, was caused by first (which had required the anticoagulation therapy in the first place)—is the product of reliable medical principles and reflects an application of those principles to the facts of this case. *See* Fed. R. Evid. 702(c)–(d); *see also Primiano*, 598 F.3d at 567 ("His methodology, essentially comparison of what happened with Ms. Primiano's artificial elbow with what surgeons who use artificial elbows ordinarily see, against a background of peer-reviewed literature, is the ordinary methodology of evidence based medicine:  'not a science but a learned profession deeply rooted in a number of sciences,' 'the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients' and 'rel[ying] on judgment—a process that is difficult to quantify or even to assess qualitatively.'") (internal footnotes and citations omitted).

Whether Dr. Watkins's opinion that the initial DVT and pulmonary embolism caused the second one, despite Mr. Johnson's preexisting conditions, is correct is a question that goes to the weight of his evidence, rather than its admissibility. *See Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) ("Remaining issues regarding the correctness of his opinion, as opposed to its relevancy and reliability, are a matter of weight, not admissibility."); *see also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, . . . the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'—to 'attack[ ] shaky but admissible evidence.'") (citations omitted); *Ladner v. U.S. Gov't*, No. 21cv1953, 2023 WL 2899534, at *5 (S.D. Cal. Apr. 11, 2023) (finding medical expert's causation opinion reliable where doctor reviewed medical history and examined plaintiff and then "relied on his own clinical experience and medical judgment to conclude that the accident . . . was the cause of [the] symptoms," and stating that "[t]o the extent that Defendant disagrees with Dr. Binder's conclusions or questions the weight of his conclusion .

14

. . these issues may be raised on cross-examination at trial.").

Accordingly, the Court will deny Defendants' motion to exclude Dr. Watkins's testimony regarding the cause or causes of Mr. Johnson's second pulmonary embolism.

### 4. Chronic Left Ankle Pain (Challenged Opinion No. 3)

Defendants also seek to exclude Dr. Watkins's opinion that Defendants caused any of Mr. Johnson's chronic left ankle pain and swelling and related past and future medical care and costs, except any such care and costs from May 30, 2020 through November 2020 caused by the projectile impact. *See* Watkins Mot. at Notice; *id.* at 2, 7–8. Dr. Watkins provides a differential diagnosis of four potential causes for Mr. Johnson's left ankle pain: (1) ulcerative colitis-related arthritis; (2) post-thrombotic syndrome due to DVT; (3) chronic ankle sprain; and (4) any combination of the prior three diagnoses. *See* Watkins Report 7, 18. Defendants argue that Dr. Watkins admits that he does not know the cause of Mr. Johnson's left ankle pain or swelling, did not conduct his own medical imaging, and does not do anything to rule out the options other than post-thrombotic syndrome (the only one potentially attributable to Defendants). *See* Watkins Mot. 7–8. Mr. Johnson counters that Dr. Watkins presented a sufficient differential diagnosis, and that Dr. Watkins is not Mr. Johnson's treating physician and had no obligation to conduct further treatment in order to form an opinion. *See* Watkins Opp'n 9–10.

It is true that "there is nothing wrong with a doctor relying on extensive clinical experience when making a differential diagnosis." *Messick*, 747 F.3d at 1198. However, the proper performance of a differential diagnosis involves "first assum[ing] the pertinence of all potential causes, then rul[ing] out the ones as to which there is no plausible evidence of causation, and then determin[ing] the most likely cause among those that cannot be excluded." *Wendell*, 858 F.3d at 1234. Here, all Dr. Watkins has done is identify the potential causes of Mr. Johnson's left ankle pain. *See* Watkins Report 18 ("The differential diagnosis *includes* post[-]thrombotic syndrome, due to DVT.") (emphasis added). Nothing in Dr. Watkins's report indicates that he ruled out the other potential causes, or even determined that post-thrombotic syndrome due to DVT was the most likely cause. Instead, Dr. Watkins later baldly states that the left ankle pain is "caused by post-thrombotic syndrome," but immediately thereafter discusses the need for a "current

1  evaluation to pin down this diagnosis, which includes a rheumatology consultation and various
2  tests, which include CBC, erythrocyte sedimentation rate, antinuclear antibody test (if positive,
3  then serum anti DNA antibody test), rheumatoid factor, serum anti-CCP test, and followup left
4  ankle x-ray to compare to previous x-ray, and an ankle MRI without contrast." *Id.* at 24.  Because
5  Dr. Watkins provides no explanation for his jump from discussing post-thrombotic syndrome as
6  one of many potential causes of Mr. Johnson's the left ankle pain to stating that the pain is in fact
7  caused by the syndrome, this opinion is inadmissible as a differential diagnosis. *See, e.g.*, *Clausen
8  v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003) ("A district court is justified in
9  excluding evidence if an expert 'utterly fails [] to offer an explanation for why the proffered
10 alternative cause' was ruled out.") (alteration omitted) (quoting *Cooper v. Smith & Nephew, Inc.*,
11 259 F.3d 194, 202 (4th Cir. 2001)).

12 Accordingly, the Court will grant Defendants' motion to exclude Dr. Watkins's opinion
13 regarding the cause of Mr. Johnson's left ankle pain.

### 5. Lifelong Treatment (Challenged Opinion No. 4)

15 Lastly, Defendants seek to exclude Dr. Watkins's opinion that it is medically necessary for
16 Mr. Johnson to have lifelong anticoagulant treatment, emergency room visits, or hospitalizations.
17 *See* Watkins Mot. at Notice; *id.* at 2, 8–9.  Dr. Watkins opines that Mr. Johnson will require
18 "lifelong anticoagulation therapy," Watkins Report at 18; and estimates that "there will be a need
19 for one to two emergency department visits annually to rule out recurrent pulmonary embolism"
20 and "at least one hospitalization per year for further evaluation of chest pain and/or treatment of
21 recurrent pulmonary embolism," *id.* at 28.  Defendants decry these opinions as unfounded
22 speculation and unscientific divination.  *See* Watkins Mot. 8–9.  Mr. Johnson argues that Dr.
23 Watkins's opinion on lifelong care were properly based on the reports in Mr. Johnson's medical
24 history from treating physicians, as well as Dr. Watkins's own clinical knowledge about the
25 effects of anticoagulants and overall experience and education as to cardiovascular and rheumatic
26 diseases.  *See* Watkins Opp'n 10–11.

27 The Court agrees with Mr. Johnson.  Dr. Watkins has stated that he relied on Mr.
28 Johnson's medical records and his own long experience with anticoagulants, as well as medical

literature, in forming his opinions. *See* Watkins Report 2. Mr. Johnson was undeniably prescribed a lifelong course of anticoagulants, *see id.* at 5, which, as Dr. Watkins has opined, is due to a risk of recurrent pulmonary embolisms that began "when the anticoagulation therapy was discontinued after six months," *see id.* at 18; *see also supra*, at Part III(B)(3). The Court finds that Dr. Watkins has adequately stated the reliable medical principles and literature on which this opinion rests. *See* Watkins Report at 17, 19–21. As for Dr. Watkins's estimates of Mr. Johnson's future emergency room visits and hospitalizations, the Court—as it explained at oral argument—considers such estimates to be well within the sphere of expertise of a medical expert with a long history of practice in the relevant fields. Greater certainty would be impossible, and would smack far more of divination than a respected expert's estimate of future needs based on past experience. *See Primiano*, 598 F.3d at 565 ("[P]hysicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to make a sound judgment.") (internal quotation marks, alterations, and citation omitted).

The Court will therefore deny Defendants' motion to exclude Dr. Watkins's testimony regarding his opinions and estimates of Mr. Johnson's future medical needs.

### 6. Conclusion Regarding Dr. Watkins's Testimony

For the reasons discussed above, the Court will grant Defendants' motion to exclude Dr. Watkins's opinion as to the cause of Mr. Johnson's left ankle pain, and otherwise deny the motion.

## IV. ORDER

It is hereby ORDERED that:

1. Defendants' Motion to Exclude Testimony of Plaintiff's Expert Roger Clark, ECF No. 110, is GRANTED IN PART as to Mr. Clark's opinions on SJPD training and policies—to the extent those opinions are relevant only to Mr. Johnson's *Monell* claim against the City based on a failure to train and supervise—and on the contents of the video evidence or Officer Adgar's credibility, state of mind, or intentions. The motion is otherwise DENIED WITHOUT PREJUDICE to any Defendants may have during examination.

2. Defendants' Motion to Exclude Expert Testimony related to Dr. Harlan Watkins,

17

ECF No. 112, is GRANTED IN PART as to Dr. Watkins's opinion as to the cause of Mr. Johnson's left ankle pain, and otherwise DENIED, including with respect to Dr. Watkins's opinions on the cause of Mr. Johnson's March 2021 pulmonary embolism and the need for future treatment.

**IT IS SO ORDERED.**

Dated: December 21, 2023

*[signature]*

Beth Labson Freeman
United States District Judge